**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

## 2684CV01663 The Giving Back Fund, Inc. et al vs. Sportico Media, LLC et al

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Torts | **FILE DATE:** | 06/04/2026 |
| **ACTION CODE:** | B15 | **CASE TRACK:** | A - Average |
| **DESCRIPTION:** | Defamation | | |
| **CASE DISPOSITION DATE:** | 07/27/2026 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 07/27/2026 |
| **CASE JUDGE:** | | **CASE SESSION:** | Civil B |

**PARTIES**

| | |
|---|---|
| **Plaintiff**<br>Pollick, Marc<br>500 Commercial Street<br>Boston, MA 02109 | **Attorney** **543842**<br>Howard Cooper<br>Todd and Weld LLP<br>Todd and Weld LLP<br>One Federal St 27th Floor<br>Boston, MA 02110<br>Work Phone (617) 720-2626<br>Added Date: 06/05/2026 |
| | **Attorney** **675447**<br>Maria Davis<br>Todd and Weld LLP<br>Todd and Weld LLP<br>One Federal St<br>Boston, MA 02110<br>Work Phone (617) 720-2626<br>Added Date: 06/04/2026 |
| **Plaintiff**<br>The Giving Back Fund, Inc.<br>500 Commercial Street<br>Boston, MA 02109 | **Attorney** **543842**<br>Howard Cooper<br>Todd and Weld LLP<br>Todd and Weld LLP<br>One Federal St 27th Floor<br>Boston, MA 02110<br>Work Phone (617) 720-2626<br>Added Date: 06/05/2026 |
| | **Attorney** **675447**<br>Maria Davis<br>Todd and Weld LLP<br>Todd and Weld LLP<br>One Federal St<br>Boston, MA 02110<br>Work Phone (617) 720-2626<br>Added Date: 06/04/2026 |
| **Defendant**<br>Libit, Daniel<br>11355 W. Olympic Blvd.<br>Los Angeles, CA 90064 | **Attorney** **647438**<br>Jeffrey Jackson Pyle<br>Prince Lobel Tye LLP<br>Prince Lobel Tye LLP<br>One International Place<br>Suite 3700<br>Boston, MA 02110<br>Work Phone (617) 456-8000<br>Added Date: 07/01/2026 |

# COMMONWEALTH OF MASSACHUSETTS
## SUFFOLK COUNTY CIVIL
## Docket Report

| **Defendant** | **Attorney** 647438 |
|---|---|
| Sportico Media, LLC<br>11355 W. Olympic Blvd.<br>Los Angeles, CA 90064 | Jeffrey Jackson Pyle<br>Prince Lobel Tye LLP<br>Prince Lobel Tye LLP<br>One International Place<br>Suite 3700<br>Boston, MA 02110<br>Work Phone (617) 456-8000<br>Added Date: 07/01/2026 |

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 06/05/2026 | Civil Filing Fee (per Plaintiff) Receipt: 53328 Date: 06/05/2026 | 240.00 | 240.00 | 0.00 | 0.00 |
| 06/05/2026 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 53328 Date: 06/05/2026 | 20.00 | 20.00 | 0.00 | 0.00 |
| 06/05/2026 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 53328 Date: 06/05/2026 | 15.00 | 15.00 | 0.00 | 0.00 |
| 06/05/2026 | Civil Filing Fee (per Plaintiff) Receipt: 53328 Date: 06/05/2026 | 240.00 | 240.00 | 0.00 | 0.00 |
| 06/05/2026 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 53328 Date: 06/05/2026 | 10.00 | 10.00 | 0.00 | 0.00 |
| | **Total** | **525.00** | **525.00** | **0.00** | **0.00** |

# COMMONWEALTH OF MASSACHUSETTS
## SUFFOLK COUNTY CIVIL
## Docket Report

**INFORMATIONAL DOCKET ENTRIES**

| Date | Ref | Description | Judge |
|---|---|---|---|
| 06/04/2026 | 1 | Complaint electronically filed. | |
| 06/04/2026 | 2 | Civil action cover sheet filed. | |
| 06/04/2026 | 3 | Plaintiff The Giving Back Fund, Inc., Marc Pollick's Motion for Appointment of Special Process Server | |
| 06/05/2026 | | Case assigned to:<br>DCM Track A - Average was added on 06/05/2026 | |
| 06/05/2026 | | EDocument sent:<br>A Tracking Order was generated and sent to:<br>Plaintiff, Attorney: Howard Cooper, Esq. hcooper@toddweld.com | |
| 06/08/2026 | | Docket Note: (2) summonses sent by mail<br><br>Applies To: Cooper, Esq., Howard (Attorney) on behalf of The Giving Back Fund, Inc. (Plaintiff) | |
| 06/09/2026 | | Endorsement on Motion for Appointment of Special Process Server (#3.0): ALLOWED<br>(Dated: 6/8/26) Notice sent 06/10/26 | Campbell |
| 07/01/2026 | 4 | Defendants Sportico Media, LLC, Daniel Libit's Submission of Acknowledgement and Waiver of Service of Summons and Complaint in Accordance with Mass. R. Civ. P.4 | |
| 07/02/2026 | 5 | Amended: and Jury Demand amended complaint filed by The Giving Back Fund, Inc., Marc Pollick | |
| 07/21/2026 | 6 | Defendants Sportico Media, LLC, Daniel Libit's Notice of Filing Notice of Removal to US District Court<br>(US Dist.# 26-cv-13325) | |
| 07/27/2026 | | REMOVED to the U.S. District Court<br>Massachusetts | |
| 07/27/2026 | | Case transferred to another court. | |

I HEREBY ATTEST AND CERTIFY ON
July 27, 2026, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 6/4/2026 6:25 PM
Superior Court - Suffolk
Docket Number

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 26-1663 B | Massachusetts Trial Court Superior Court 2 |
|---|---|---|
| | | COUNTY Suffolk Superior Court |

| | | | |
|---|---|---|---|
| **Plaintiff** | The Giving Back Fund, Inc. | **Defendant:** | Sportico Media, LLC |
| ADDRESS: | 500 Commercial Street | ADDRESS: | 11355 W. Olympic Blvd. |
| | Boston, MA 02109 | | Los Angeles, CA 90064 |
| | | | |
| **Plaintiff:** | Marc Pollick | **Defendant:** | Daniel Libit |
| ADDRESS: | 500 Commercial Street | ADDRESS: | 11355 W. Olympic Blvd. |
| | Boston, MA 02109 | | Los Angeles, CA 90064 |
| | | | |
| **Plaintiff Attorney:** | Howard M. Cooper, Esq. | **Defendant Attorney:** | kg |
| ADDRESS: | Todd & Weld LLP | ADDRESS: | |
| | One Federal Street, 27th Floor | | |
| | Boston, MA 02110 | | |
| BBO: | 543842 | BBO: | |
| **Plaintiff Attorney:** | Maria Davis, Esq. | **Defendant Attorney:** | |
| ADDRESS: | Todd & Weld LLP | ADDRESS: | |
| | One Federal Street, 27th Floor | | |
| | Boston, MA 02110 | | |
| BBO: | 675447 | BBO: | |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B15 | Defamation | A | ☒ YES ☐ NO |

***If "Other" please describe:**

**Is there a claim under G.L. c. 93A?** ☐ YES ☒ NO

**Is there a class action under Mass. R. Civ. P. 23?** ☐ YES ☒ NO

**STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

**TORT CLAIMS**

A. Documented medical expenses to date

1. Total hospital expenses
2. Total doctor expenses
3. Total chiropractic expenses
4. Total physical therapy expenses
5. Total other expenses (describe below)

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date

C. Documented property damages to date

D. Reasonably anticipated future medical and hospital expenses

E. Reasonably anticipated lost wages

F. Other documented items of damages (describe below)

TOTAL (A-F): $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|

| | | |
|---|---|---|
| | Defamation and tortious interference with business relationships resulting in reputational and monetary damages $1,000,000.00+ | |
| | Total | $1,000,000.00+ |

Signature of Attorney/Self-Represented Plaintiff: X /s/ Howard M. Cooper, Esq — Date: June 4, 2026

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION UNDER S.J.C. RULE 1:18(5)**

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18: Uniform Rules on Dispute Resolution, requiring that I inform my clients about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney: X /s/ Howard M. Cooper, Esq. — Date: June 4, 2026

I HEREBY ATTEST AND CERTIFY ON July 27, 2026, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

# CIVIL ACTION COVER SHEET INSTRUCTIONS — SELECT A CATEGORY THAT BEST DESCRIBES YOUR CASE*

**AC Actions Involving the State/Municipality†***

AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. (A)
AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. (A)
AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. (A)
AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. (A)

**CN Contract/Business Cases**

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal Affairs of Entities (A)
BA3 Liability of Shareholders, Directors, Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

* See Superior Court Standing Order 1-88 for an explanation of the tracking deadlines for each track designation: F, A, and X. On this page, the track designation for each case type is noted in parentheses.

†* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

‡ Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c. 231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

**PA Civil Actions Involving Incarcerated Party ‡**

PA1 Contract Action involving an Incarcerated Party (A)
PB1 Tortious Action involving an Incarcerated Party (A)
PC1 Real Property Action involving an Incarcerated Party (F)
PD1 Equity Action involving an Incarcerated Party (F)
PE1 Administrative Action involving an Incarcerated Party (F)

**TR Torts**

B03 Motor Vehicle Negligence - Personal Injury/Property Damage (F)
B04 Other Negligence - Personal Injury/Property Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical (A)
B07 Malpractice - Other (A)
B08 Wrongful Death - Non-medical (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

**RP Summary Process (Real Property)**

S01 Summary Process - Residential (X)
S02 Summary Process - Commercial/ Non-residential (F)

**RP Real Property**

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

**MC Miscellaneous Civil Actions**

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10, § 28 (X)

**AB Abuse/Harassment Prevention**

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E (X)

**AA Administrative Civil Actions**

E02 Appeal from Administrative Agency, G.L. c. 30A (X)
E03 Certiorari Action, G.L. c. 249, § 4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8 (X)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12, § 11H (A)
E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) (X)
E94 Forfeiture, G.L. c. 265, § 56 (X)
E95 Forfeiture, G.L. c. 94C, § 47 (F)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B (F)
Z02 Appeal Bond Denial (X)

**SO Sex Offender Review**

E12 SDP Commitment, G.L. c. 123A, § 12 (X)
E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

**RC Restricted Civil Actions**

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S (X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

## STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** — On the face of the Civil Action Cover Sheet (or on attached additional sheets, if necessary), the plaintiff shall state the facts on which the plaintiff relies to determine money damages. A copy of the completed Civil Action Cover Sheet, including the statement concerning damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT** — If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with the defendant's answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT. IF THIS COVER SHEET IS NOT FILLED OUT THOROUGHLY AND ACCURATELY, THE CASE MAY BE DISMISSED.**

1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT DEPT. OF THE TRIAL COURT

26-1663 B

THE GIVING BACK FUND, INC. and MARC POLLICK

Plaintiffs,

v.

SPORTICO MEDIA, LLC and DANIEL LIBIT

Defendants.

CIVIL ACTION NO.
kg

**COMPLAINT AND JURY DEMAND**

**i. Introduction**

1. Plaintiffs, The Giving Back Fund, Inc. ("GBF") and its leader Marc Pollick ("Mr. Pollick") (together "Plaintiffs"), bring this action for, *inter alia,* defamation and tortious interference with advantageous business relations against Defendants, Sportico Media, LLC ("Sportico") and Daniel Libit ("Mr. Libit") (together "Defendants"). Plaintiffs seek to recover damages necessary to make them whole for the substantial harm Defendants caused them as a result of Defendants' publication in bad faith, negligently and/or with a knowing or reckless disregard of the truth, numerous false and defamatory lies concerning Plaintiffs. GBF is a non-profit, charitable organization which has been led by Mr. Pollick for many years. Until Defendants undertook their unlawful defamation campaign, both GBF and Mr. Pollick had long enjoyed hard-earned and well-deserved stellar reputations. Defendants' lies, including their lies about Plaintiffs' important charitable endeavors, unlawfully and substantially damaged

Plaintiffs' reputations and caused other injuries. Defendants are liable for damages for their wrongdoing and the harm they caused.

**ii. Parties**

2. Plaintiff GBF is a Massachusetts nonprofit corporation with a principal place of business located at 500 Commercial Street in Boston, Suffolk County, Massachusetts. As a Massachusetts based non-profit, GBF is subject to oversight within the Commonwealth.

3. Plaintiff Mr. Pollick is an individual and the founder and President of GBF.

4. Defendant Sportico is a Delaware corporation with a principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, California 90064. At all times relevant hereto, including during much of its unlawful defamation campaign, Sportico was registered to do business in the Commonwealth.

5. Defendant Mr. Libit is an individual who upon information and belief resides in Chicago, Illinois. Mr. Libit regularly publishes pieces he authors into the Commonwealth including the defamatory publications at issue here.

**iii. Jurisdiction and Venue**

6. The exercise of personal jurisdiction over Sportico and Mr. Libit is lawful and proper where Defendants published their false and defamatory statements attacking Plaintiffs on the Sportico digital platform by which Defendants intended to and did in fact reach audiences in Massachusetts. Defendants knowingly published into Massachusetts and were fully aware that their false and defamatory statements would cause injury to Plaintiffs here.

7. Venue is lawful and proper in Suffolk County because Defendants' false and defamatory statements caused injury to Plaintiffs here.

## iv. Facts

### About The Giving Back Fund and Mr. Pollick

8. Mr. Pollick founded GBF in 1997 with the goal of helping professional athletes, celebrities, high-net-worth individuals, corporations, and others establish and maintain charitable foundations.

9. GBF is a non-profit organization that provides philanthropic consulting, management and administrative services to donors. Among other things, GBF strives to and succeeds in helping its donors make the greatest charitable impact possible.

10. GBF's commitment to its mission and to its donors has been a success. Over nearly three decades, GBF has launched more than 1,000 foundations. It has facilitated more than one billion dollars in donations and grants to thousands of causes across the world.

11. GBF has supported causes including, without limitation, researching cures for numerous diseases, treatment of mental health disorders, earthquake relief, education for women and girls in Africa, scholarships, fighting discrimination, and hundreds of other important causes.

12. GBF has had the opportunity to work with funds established by individuals including Yao Ming, Doug Flutie, Jim Brown, Pelé, Steve Gleason, Jalen Rose, and Cara Delevingne, among other well-known individuals.

13. GBF continues to work tirelessly to expand the number of people and the amount of resources dedicated to charitable giving.

14. One of the ways in which GBF works to carry out its mission is by hosting events to raise funds for charities. GBF's signature event, held every year between 2009 and 2024 (other than when affected by Covid), has been the "Big Game Big Give" ("BGBG") event held during the week of the Super Bowl.

15. The BGBG is hosted by celebrities who volunteer their participation in exchange for a contribution to the celebrity host's chosen charity. The event has raised over $11 million dollars and benefited numerous charities around the country. Celebrities including, without limitation, Michael Bay, Jamie Foxx, Mark Wahlberg, Joe Montana, Rob Lowe, Jay Leno, Alec Baldwin, Hilary Swank, David Schwimmer, Michael Phelps and The Black Eyed Peas have hosted the event in the past. Sponsors of the BGBG have included J.P. Morgan, Goldman Sachs, AOL, Aston Martin, BMW, Lamborghini, USA Today, and Forbes, among other well-known companies.

16. GBF produces its BGBG event (and others) on a relatively modest budget and relies on the significant donations of others to put on the event. GBF's BGBG event consistently has been viewed as a spectacular success and is repeatedly attended by many of the same guests, donors, and participants. Michael Bay has hosted it without charge four times, as has Academy Award Winner Jamie Foxx.

**About Sportico**

17. Penske Media Corporation launched Sportico in 2020. Sportico styles itself as a media news platform and professes on its website to be "the premier destination for professionals and informed readers seeking authoritative news and analysis on the $500 billion global sports industry." Sportico further touts itself as providing news and analysis "covering every facet of the business of sports" through its "robust digital platform, newsletters, and live events." In fact, Sportico is a sensationalistic outlet willing to knowingly publish falsehoods as alleged herein.

**Sportico and Mr. Libit's Defamation of GBF and Mr. Pollick**

18. In or about 2023, Sportico and Mr. Libit conceived of and began a months long defamation campaign targeted at GBF and its founder, Mr. Pollick.

19. Sportico and Mr. Libit published numerous damaging false and defamatory statements of alleged fact regarding both GBF and Mr. Pollick, some of which were knowingly and recklessly fabricated or which were published negligently. Worse, Sportico and Mr. Libit continued to publish in blatant disregard of the actual facts after the actual facts were provided to them.

20. Upon information and belief, the source for Defendants' information was a known and obviously disgruntled former professional whom GBF had terminated its relationship with, whose bias was clear from publicly available sources including a lawsuit, and who had threatened GBF and Mr. Pollick in writing for having terminated him.

21. Some of the specific false and misleading allegations in Defendants' three (3) articles are set forth below, without limitation.

22. As is well known, GBF is an extremely well-run and effective charity. Over the past 29 years, under Mr. Pollick's leadership, GBF has created more than 1,000 foundations all over the world and has facilitated the distribution of more than *one billion dollars* to people in desperate need. GBF's taxes are prepared annually by national CPA firms, and its financial reports have passed their audited inspections each year for its 29 years. *Not once*, until the appearance of Defendants' false and defamatory articles, has anybody accused Mr. Pollick of having been dishonest, or of having engaged in fraud, financial wrongdoing, employee harassment, or any other nefarious conduct whatsoever. To the contrary, all prior reporting on GBF and Mr. Pollick over the past three decades—including hundreds of magazine and newspaper articles— have lauded GBF's tireless work for charities and people in need.

23. On May 1, 2023, Sportico and Mr. Libit published its first article written by Mr. Libit. Defendants published this article under the false and defamatory headline "**Damar**

**Hamlin's Charity Sponsor, the Giving Back Fund, Embroiled in Strife."** Defendants published their article on the Sportico website, www.sportico.com/business/sports/2023/damar-hamlin-charity-sponsor-giving-back-fund-1234721053/. The headline was false and defamatory and known by Defendants to be false and defamatory.

24. In their article, Mr. Libit and Sportico knowingly made numerous false statements regarding GBF and Mr. Pollick in order to falsely portray GBF as "an organization in strife and falling short of its sterling reputation[,]" with Mr. Pollick falsely portrayed as "the primary source of discontent." Defendants also reported false statements made almost exclusively anonymously by people who would not go on the record.

25. Defendants' knowingly false statements in the first article which are at issue here include but are not limited to the following:

a. Defendants falsely reported that GBF's "2021 tax return's statement of functional expenses contained numerous empty categories on line items such as legal, accounting and benefits paid to current top employees. These had previously been filled out in earlier returns. The organization reported spending about $3.4 million on "professional fees" in 2021, yet included no names in the section of the tax return for independent contractors earning at least $100,000." These statements were false, omit material information, and are misleading, as Defendants knew. GBF's tax returns have been prepared by reputable national firms and approved by its long-time certified public accountant, board, treasurer, and finance committee. GBF's tax returns have also passed 28 consecutive outside audits without ever receiving a management letter.

b. Defendants falsely reported that "[m]ultiple staffers and former clients say it has been a common occurrence for earmarked donations to be initially placed in the wrong accounts." This statement was false and misleading, as Defendants knew. While donations often arrive at GBF with no designation, GBF is scrupulous in reaching out to track down each donor to ensure that their donation, often made anonymously, is credited to the foundation for which it was intended.

c. Defendants falsely reported that "[w]hile touting itself as 'more than a fiscal sponsor,' former employees say GBF has long struggled to carry out the basic functions of a fiscal sponsor: depositing charitable contributions, keeping track of the money and providing solicitation notices to donors. Even the job of reconciling client accounts has proven to be an ever-elusive challenge. Of the 168 accounts that GBF had on its books last summer, only a third were considered 'in good standing,' internal

documents show." These statements were false and based on a misinterpretation of internal records that Defendants improperly sourced, as Defendants knew. GBF has been responsible for over 1,000 foundations, each of which required and received proper financial management.

d. Defendants falsely reported that "[m]any clients had to fight for a long time,' one former employee said. 'Most of them that I have seen ended up reaching some sort of compromise where they leave a lot of money at the Giving Back Fund.'" This statement was false, as Defendants knew. No client has ever had to fight for their money and no client has ever "left a lot of money" at GBF.

e. Defendants falsely reported that "[o]n the other end of the spectrum are clients like the Yao Ming Foundation, which multiple staffers say has effectively operated as a dormant GBF project for the last decade, while still shelling out some of the highest client fees. Yao's charity, launched in 2008 as a response to the deadly Sichuan earthquake, had been paying GBF $5,000 a month through mid-2021, when its fee was cut to $4,000 a month. (Messages left with Yao's agency, WME, did not receive a response.)." This statement was false and misleading, as Defendants knew. Mr. Ming's foundation is not dormant and receives significant donations every year and has made and received hundreds of thousands of dollars in grants.

f. Defendants falsely reported a "whistleblower's" statement that Mr. Pollick "had been barred from renting vehicles through Hertz because of a long-ago surcharge for damaging a rental vehicle that he wouldn't make good on." This statement was false as Defendants knew and were told in advance of publication. A Hertz representative collected the car from Mr. Pollick after a tire went flat and returned it to the wrong Hertz location. Hertz thought that it was Mr. Pollick who had returned the car to the wrong location and thus erroneously added a fee to his bill. The error was corrected and Mr. Pollick was not charged.

g. Defendants falsely reported the whistleblower's statement that in order to cancel airfare without a charge, Mr. Pollick would "sometimes l[ie] to say he had Covid" and that they were "not comfortable lying for him, so he would have me patch him in after waiting on hold. I booked and canceled the same pre-BGBG trip for him around 5 separate times." This statement was false, as Defendants knew. Mr. Pollick never lied to cancel or reschedule anything.

h. Defendants falsely reported that the whistleblower had reported "[e]mployees are scared of [Mr. Pollick's] retribution," and falsely reported that the same sentiment was "echoed by each of the two dozen former staffers who spoke to Sportico." This statement was false, as Defendants knew or should have known. Mr. Pollick has never taken "retribution" against any employee at any time, has not threatened to do so, has not been reported as doing so, and employees are not "scared" of him. This statement by Defendants is false.

i. Defendants falsely reported that GBF board member Joanne Pasternack quit the board and that her departure "closely followed those of two other directors, Danny Hughes

and Keeley Mooneyhan." These statements were false and misleading. Ms. Pasternack resigned only when faced with a Board Meeting specifically called to vote on whether to remove her from the board for cause, where all board members were expected to vote for her removal. At that time Ms. Pasternack had already been asked to step down twice and did not willingly "quit." Mr. Hughes left, after Ms. Pasternack, simply because his board term was over. Ms. Mooneyhan had left eight months before Ms. Pasternak because she had lost her job. Defendants' insinuation that there was a resignation of multiple board members *en masse* reflected a broader concern and was therefore false and misleading.

j. Defendants negligently and/or with actual malice reported that GBF's "[i]nternal documents also showed that in April 2020, GBF reimbursed NEXUS for a $41,800 payment it made to Spark Neuro, the company owned by the husband of NEXUS co-founder Rachel Gerrol, to rent office space in New York City. Former employees say they were troubled by what they perceived as a potential conflict of interest, but that it didn't matter." This statement was false, misleading, and omitted material information, as Defendants knew and were told in advance of publication. Ms. Gerrol's husband had given NEXUS office space at a substantial discount to save NEXUS, a charity, money. There was no potential conflict or any mismanagement of funds.

k. Defendants falsely reported that "Pollick's exhaustive list of personae non gratae includes some of his once-closest confidants." This statement was false, as Defendants knew. Mr. Pollick did not have an exhaustive list of personae non gratae including some of his once-closest confidants and the only example Defendants provided was a professional whom GBF sued and settled against based on his breach of duties to GBF.

l. Defendants falsely reported, after making a series of false and defamatory statements, "And yet, Pollick's public image has endured unscathed[,]" implying that there would be a reason for Mr. Pollick's reputation to have been harmed. This statement was false and misleading, as Defendants knew. As set forth above, Mr. Pollick has led GBF for 29 years, has created more than 1,000 foundations all over the world, and has facilitated the distribution of more than one billion dollars. He has never been accused of or found to have been dishonest, of having engaged in fraud, having engaged in employee harassment, or having conducted any other form of criminal wrongdoing.

m. Defendants falsely reported that "[i]n 2002, the Giving Back Fund made headlines when it filed a $15 million lawsuit against Britney Spears' former lawyer, Mark Steverson, following the pop star's decision to end her relationship with the GBF[,]" implying that GBF's lawsuit was motivated by Ms. Spears' decision to leave GBF. This statement was false, misleading, and omits material information, as Defendants knew. The lawsuit was based on the insistence of Mr. Steverson, who was a GBF board member, on using charitable funds for non-charitable purposes. GBF's board voted 14-0 to remove Mr. Stevenson as a board member and brought a publicly

accessible lawsuit against him for breach of fiduciary duty and breach of loyalty. The case was settled almost immediately in favor of GBF.

n. Defendants falsely reported that its source was a "whistleblower letter," implying that the individual writing the letter had acted at their own risk to call out wrongdoing by GBF. This statement was false, misleading, and omits material information. The employee Defendants dubbed a "whistleblower" was terminated after being found to have engaged in malfeasance through the investigation of an independent outside law firm. That investigation also showed that the allegations in the letter were false. The individual identified as the whistleblower refused to confirm that they had written the letter during the investigation and has since withdrawn the allegations in their letter.

o. Defendants falsely reported "[b]ut that is not the full story that emerges from interviews with dozens of sources—including clients, donors, contractors, board members and 24 former GBF employees—as well as a review of hundreds of pages of internal documents. Collectively, they portray an organization struggling to carry out basic oversight and accounting functions, and steeped in fear of its leader." This statement is false, misleading, and omits material information, as Defendants knew or should have known. Defendants implied they had significant sources that supported their false claim but only reported on limited sources whose narratives fit their story. Defendants omitted or did not seek information from numerous individuals from the 29-year-old GBF who would have truthfully and vigorously supported GBF and Mr. Pollick.

p. Defendants falsely reported a statement from Lisa Greer, who falsely reported that "at Pollick's solicitation, joined GBF's board as its president in 2021 before quitting three months later." Defendants also published the false statement from Ms. Greer "I encountered a great deal of resistance and great deal of anger with just trying to help the organization." These statements were false, misleading, and omitted material information, as Defendants knew or should have known. Ms. Greer was recruited as GBF's Chair, a role in which she served for only three months before she was asked to resign for improper conduct. Ms. Greer's opinion was not representative of GBF's other board members and employees, many of which were longstanding board members and employees.

q. Defendants falsely reported that a sign of strife was that GBF had a falling out with its longtime counsel, Andrew Morton. These statements were false and misleading, as Defendants knew. Attorney Morton was not a longtime counsel, was not on retainer with GBF, and was solely consulted from time to time on legal matters.

r. Defendants falsely reported that Attorney Morton "delivered a number of his athlete clients to the organization." This statement is false, as Defendants knew or should have known. Attorney Morton never delivered any client to GBF.

s. Defendants falsely reported "But GBF—having shuffled through several compliance companies over the last year—had been delinquent with its charity registrations in multiple states, according to multiple sources familiar with the situation." This

statement is false and misleading, as Defendants knew or should have known. GBF did not "shuffle" through several compliance companies, it sought a new company when its long term compliance company was no longer suitable and its first replacement was not a good fit for GBF. GBF retained its current firm which brought GBF compliant that same day.

t. Defendants falsely reported that "[e]arlier this year, Pollick settled a three-year-old lawsuit he filed against the Diplomat Beach Resort in Hollywood, Fla., which he originally sued for injuries and lost wages he claimed he suffered after colliding with a sliding glass door while staying at the hotel in 2019. At the time, Pollick was in Florida scouting a location for an upcoming Big Game Big Give party. Pollick, who receives an annual salary of around $250,000, eventually dropped his lost-wages claim, which could have required him to submit to discovery related to GBF's business." This statement is false and misleading, as Defendants knew, because it implied that Mr. Pollick dismissed his lost wages claim to avoid having to produce discovery related to GBF's business. There is no factual basis for this implication.

u. Defendants falsely reported that "Pollick's on-the-fly desire to sign up new clients led to a capricious fee structure, the former staffers say." This statement is false, as Defendants knew or should have known. Mr. Pollick did not and does not set client fees. Fees are set by the leadership team as a whole, through consensus.

26. On July 11, 2023, Sportico and Mr. Libit published their second article, also written by Mr. Libit, falsely headlined "**Giving Back Fund Investigates CEO, Fires Whistleblower**" on its website, www.sportico.com/business/sports/2023/giving-back-fund-investigation-ceo-whistleblower-1234730092/.

27. In the article, Mr. Libit and Sportico made numerous false statements regarding GBF and Mr. Pollick and reported on the false statements of others without properly validating the statements.

28. Defendants' false statements in the second article at issue here include but are not limited to the following:

a. Defendants' headline for the article was itself false and misleading. The title implies that GBF conducted its own investigation, which was ongoing, and fired an individual in retaliation for their proper reporting of misconduct. This statement was false and misleading, as Defendants knew. GBF hired Rubin & Rudman LLP, an independent and respected law firm, to investigate the administrative assistant's complaints regarding GBF and Mr. Pollick. The investigation was already complete when the

article was released and established that the neither GBF nor Mr. Pollick had committed any wrongdoing. Further, the employee was terminated for misconduct.

b. Defendants falsely reported that "[t]he employee who spoke up, however, was dismissed." This statement was false, misleading, omitted material information, as Defendants knew, and implied that the employee spoke up to raise legitimate concerns and was wrongly terminated. No employee "spoke up" of any material wrongdoing and no GBF employee was ever dismissed because they made a complaint. The employee was properly terminated for performance issues and misconduct. Here, the employee at issue was terminated because of the reasons stated above, not because of any protected activity.

c. Defendants falsely reported that "[w]hat emerged was a behind-the-scenes picture of an organization that, despite its four-star [Charity Navigator Rating], has long struggled to carry out some of the basic functions of a philanthropic fiscal sponsor, often promises more than it can deliver and is routinely impaired by the combative and wayward tendencies of its leader." These statements were false, as Defendants knew or should have known. As set forth above, GBF was and is a successful organization and owes much of its success to Mr. Pollick's dedication, leadership, and ability to work with clients, charities, and donors.

d. Defendants falsely reported that "[t]he upshot of the investigation appears to maintain the status quo, with Pollick having weathered it without so much as a slap on the wrist." These statements were false, misleading, show bias and malice, and omitted material information, as Defendants knew, and implied that Mr. Pollick deserved to be punished. The investigation resulted in no punishment for Mr. Pollick because Mr. Pollick was cleared of all wrongdoing by the investigation and there was no reason to punish him.

e. Defendants falsely reported that "Pollick remained, but within a year, most of those board members had quit, one of many exoduses of staff or directors at GBF." This statement was false, as Defendants knew, and wrongfully implied that individuals fled GBF because of GBF or Mr. Pollick's conduct. Over the years, GBF has had to ask certain members of the board to step down when their goals or motives did not align with GBF, but there has never been an exodus of staff or directors.

f. Defendants falsely reported that "[a] recent outside investigation into a whistleblower's complaints against the head of the Giving Back Fund, the fiscal sponsor for Damar Hamlin . . . and other pro athlete charities, resulted in no punishment for the executive." This statement was false, misleading, omitted material information, as Defendants knew, and implied that Mr. Pollick deserved to be punished. The investigation resulted in no punishment for Mr. Pollick because Mr. Pollick was cleared of all wrongdoing by the investigation and there was no reason to punish him. Defendants, who repeatedly referenced the investigation in the article, were aware that the investigation had concluded and that Mr. Pollick had been cleared of any and all wrongdoing.

g. Defendants falsely reported that "[i]n her resignation, she had recommended that GBF's board do a 12-point, top-down review of the organization, from its finances to various critical postings that had been made over the years on employment websites like Glassdoor and Indeed." This statement was false and misleading, as Defendants knew, because it wrongly implied that Ms. Pasternack made the decision to resign on her own. As set forth above, Ms. Pasternack resigned only when faced with a board meeting specifically called to vote on whether or not to remove her from the board for cause, where all board members were expected to vote for her removal. At that time Ms. Pasternack had already been asked to step down twice.

29. On February 8, 2024, Sportico and Mr. Libit published their third article, again written by Mr. Libit, falsely headlined "**Super Bowl Fundraiser BGBG Tries Luck in Vegas After Arizona 'Disaster'**" on its website, www.sportico.com/leagues/football/2024/giving-back-fund-big-game-big-give-super-bowl-las-vegas-1234765670/.

30. Defendants knowingly and maliciously released this article one day before GBF's biggest event of the year, the 2024 BGBG event, which was to be hosted by comedian Kevin Hart. Leading up to the event, Mr. Libit reached out to Mr. Hart's representatives for comment. Upon information and belief, Defendants chose to release the article the day before the BGBG event despite the article having been completed and ready for publication well before the publication date.

31. Sportico and Mr. Libit made additional false statements regarding GBF and Mr. Pollick in their February 2024 article and reported on the false statements of others without properly assessing the truth of the statements.

32. Those false statements in the third article include but are not limited to the following:

a. Defendants falsely reported "[t]hat the party has been able to survive for so long, former employees observed, owes in large part to the transient nature of the Super Bowl, offering Pollick a chance to start from scratch each year in a different city while the prior event's bridges smoldered behind him." This statement is false and omits material information, as Defendants knew. The BGBG events have been overwhelmingly positive and GBF has repeatedly worked with certain partners, celebrity hosts, and homeowners for multiple BGBG events.

b. Defendants falsely reported that "[f]ollowing the 2017 BGBG held in Houston, participants received tax deduction letters stating the event was 'able to raise more than $1 million for eight worthwhile charities.' On the Giving Back Fund's tax return that year, the fundraiser was shown to have grossed $1.36 million in revenue, while costing $1.11 million in directly related expenses. Making up that latter figure were rent and facility costs of $192,322; food and beverage costs of $194,208; $85,171 for entertainment; and $637,296 in 'other direct expenses.'" These statements were false, as Defendants knew. They did not reflect true numbers for the BGBG event and reflect categories of expenses that are not related to the BGBG event. For example, the use of the home where the event was held was donated and there was no rental cost at all. Further, donations to charities are typically part of the expenses of the event. These statements gave an extremely distorted impression to the reader, which is journalistically unfair.

c. Defendants reported the 2023 BGBG event planner's false statement that she had threatened to take legal action for nonpayment of a $22,500 fee. This report was false, as Defendants knew or should have known. There was no fee due and the event planner had been overpaid. Defendants failed to properly validate this statement. In fact, GBF advised Defendants that she was paid more than she was owed prior to publication of the article. Defendants chose not to include GBF's position in its article.

d. Defendants falsely reported that "[u]nbeknownst to the public, however, is how many of these parties have left a trail of controversy." This statement was false, as Defendants knew, and wrongly implied that Defendants have information that a large number of the BGBG parties have been embroiled in controversy. This is not accurate, and indeed, GBF's events have been overwhelmingly positive and successful. In just its second year, 2010, BGBG was named the Number One Event at the Super Bowl by ESPN The Magazine. Indeed, GBF's event consistently has been hailed by hundreds of media outlets as the best at the Super Bowl, year in and year out.

e. Defendants falsely reported that "[t]his pattern of turmoil is attested to by hundreds of pages of documents and dozens of people who spoke to Sportico for this story, most on the condition that they not be identified, for fear of retribution." This statement is false, as Defendants knew. Mr. Pollick has never taken "retribution" against any employee at any time, has not threatened to do so, and has not been reported as doing so.

f. Defendants falsely reported that "[t]he year before, the party in conjunction with the LA Super Bowl took place in the Metaverse—with some fairly adverse results . . . [.]" This statement was false, as Defendants knew. The event had been hosted by Rob Lowe, was the first Super Bowl event ever held in the Metaverse, and went very well. As one example only, Meta had donated to GBF its substantial work on the virtual stadium worth more than $2 Million and after the event donated the entire virtual stadium to GBF.

g. Defendants falsely reported that "[a]ll of a sudden, Pollick was presented with dueling objectives: the unassuming work running a fiscal sponsor for nonprofit clients, and the more glamorous job of rubbing elbows with A-listers on Super Bowl weekend. In time, according to a number of those who worked for Pollick, the latter came to outstrip the former." This statement is false, as Defendants knew. Mr. Pollick's focus is and has always been on the running of GBF and its philanthropy. The BGBG events attended by celebrities raised money not only for their own charities but also for GBF to allow it to pay salaries to its employees and to fund GBF's Fund for the Advancement of Philanthropy. This fund has allowed GBF to support start-up nonprofits with limited funds and other missions.

h. Defendants falsely reported, to support its claim that GBF was spending beyond its means, "[a]ccording to a copy of Wahlberg's hosting agreement *Sportico* obtained, GBF agreed to provide a private jet—specifically, an Embraer Legacy 600 aircraft—to shuttle the actor and up to a dozen guests from New Orleans to Los Angeles, to Phoenix, and then back to New Orleans." This statement falsely implied that GBF paid for the private jet, which was is not true, as Defendants knew. The private jet was donated for the event and GBF has never paid for a private jet for any celebrity.

i. Defendants falsely reported that "[w]hile GBF has followed through on some of its celebrity appearance commitments for last year—Connie Watt, the mother of J.J. Watt, confirmed that their organization received its $100,000 remittance—representatives of Ray Lewis and Patrick Willis say they have not received their shares. And the Giving Back Fund's board now suggests it is not inclined to make good on those. This statement was false, as Defendants knew. These individuals were not paid because GBF never agreed to pay them and, like other celebrities, they donated their time to the event.

33. All of the above statements are false and defamatory. Defendants published all of the above false statements with actual malice, a knowing or reckless disregard of the truth, and/or negligently.

34. In pursuit of a preconceived and sensationalistic agenda, Defendants carefully tailored their information gathering to rely only upon biased individuals, and willfully failed to review public and other information available to them that would have disproven the information relied upon. In short, Defendants deliberately decided to portray GBF as a failing entity and Mr. Pollick as a bad actor.

35. Defendants' numerous defamatory statements reached people across the country, and beyond, including in Massachusetts, via Defendants' self-described "robust" network, and

resulted in harm to both GBF and Mr. Pollick's reputations in Massachusetts and across the country.

**Sportico's and Mr. Libit's Interference with GBF's and Mr. Pollick's Business**

36. As alleged above, Defendants intentionally released their February 8, 2024 article one day before GBF's 2024 BGBG, which was to be hosted by the internationally known comedian Kevin Hart. Mr. Libit reached out to Mr. Hart's representative for comment prior to publishing the article. Mr. Libit knew at the time that he contacted Mr. Hart's representative that Mr. Hart was scheduled to host the BGBG.

37. Mr. Libit advised Mr. Hart's representative that he was about to publish a negative article about GBF, Mr. Pollick, and the BGBG. Upon information and belief, Mr. Libit advised Mr. Hart's representative of numerous falsities of and concerning GBF and Mr. Pollick in order to convey the false message that BGBG was a financial disaster and worse.

38. As a result of Mr. Libit's false statements to Mr. Hart's representative, Mr. Hart drastically reduced his role and profile at the event. Mr. Hart instructed GBF that (1) GBF could not use his name or likeness in promoting the 2024 GBGBG event; (2) GBF could not inform anyone that Mr. Hart would be hosting the event; and (3) GBF could not put GBF signage at the event—which was GBF's own event.

39. As a result of Mr. Hart's limitations, GBF was unable to properly promote the BGBG event. Because of Mr. Libit's interference, revenue from the event was substantially decreased.

40. Mr. Libit's interference destroyed the prior advantageous relationship between GBF and Mr. Hart.

## V. COUNTS

### COUNT I - DEFAMATION

**The Giving Back Fund, Inc. and Marc Pollick v. Defendants**

41. Plaintiffs repeat and reallege here all of the allegations set forth above.

42. Sportico and Mr. Libit published their false and defamatory statements of and concerning Plaintiffs with actual malice—a knowing or reckless disregard of the truth. Plaintiffs are not public figures nor are they limited purpose public figures such that they need only prove Defendants' negligent publication.

43. Sportico and Mr. Libit's defamatory statements of and concerning Plaintiffs were defamatory per se.

44. Sportico and Mr. Libit's defamatory statements damaged GBF and Mr. Pollick for which Sportico and Mr. Libit are liable.

### COUNT II – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

**The Giving Back Fund, Inc. v. Defendants**

45. Plaintiffs repeat and reallege here all of the allegations set forth above.

46. GBF had a business relationship with Mr. Hart.

47. Mr. Libit was aware of GBF's business relationship with Mr. Hart.

48. Mr. Libit intentionally contacted Mr. Hart on behalf of Sportico in order to publish false and defamatory statements regarding GBF and Mr. Pollick to him in order to cause damages to GBF and to further Defendants' false story. Mr. Libit acted intentionally with the improper motive of undermining GBF's relationship with Mr. Hart and to harm GBF.

49. As a result of Mr. Libit's interference, Mr. Hart significantly curtailed his involvement with GBF.

50. GBF suffered harm as a result of Mr. Libit's interference with GBF's business agreement with Mr. Hart including lost business and lost income.

**COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Marc Pollick v. Defendants**

51. Plaintiffs repeat and reallege here all of the allegations set forth above.

52. Defendants knew and intended that their publication of false statements concerning Mr. Pollick and the GBF would cause Mr. Pollick emotional distress.

53. Defendants' conduct as set forth above was extreme and outrageous and beyond the bounds of common decency.

54. Mr. Pollick suffered severe emotional distress as a result of Defendants' conduct.

55. Mr. Pollick's severe emotional distress, caused by Defendants' intentional, malicious conduct, was of such a nature that no reasonable person could be expected to endure it.

56. Defendants' actions resulted in damages to Mr. Pollick, including ongoing severe emotional distress and monetary losses.

**COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**Marc Pollick v. Defendants**

57. Mr. Pollick repeats the allegations set forth above as if fully contained herein.

58. Defendants took actions that they knew or should have known would cause Mr. Pollick emotional distress.

59. Mr. Pollick suffered severe emotional distress as a result of Defendants' negligent conduct, including without limitation causing him nausea, loss of appetite, sleeplessness, and anxiety.

60. A reasonable person would have suffered emotional distress as a result of Defendants' actions.

61. Defendants' actions resulted in damages to Mr. Pollick, including ongoing severe emotional distress and monetary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs The Giving Back Fund, Inc. and Marc Pollick respectfully request that this Court:

i. enter judgment in favor of Plaintiffs and award Plaintiffs damages on the counts set forth above;

ii. order injunctive relief requiring Defendants to immediately remove the articles referenced in Paragraphs 23, 26, and 29 from the Sportico website and any other medium in which they published or referenced the articles and preventing Defendants from disseminating the articles further;

iii. award The Giving Back Fund, Inc. and Marc Pollick their attorneys' fees and costs; and

iv. grant such other and further relief as the Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

THE GIVING BACK FUND AND
MARC POLLICK,

By their attorneys,

/s/ Howard M. Cooper
Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Maria T. Davis (BBO # 675447)
mdavis@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated: June 4, 2026

I HEREBY ATTEST AND CERTIFY ON July 27, 2026, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 6/4/2026 6:25 PM
Superior Court - Suffolk
Docket Number

6/9

3

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 26-1663B

| | |
|---|---|
| THE GIVING BACK FUND, INC. and MARC POLLICK,<br><br>Plaintiffs,<br><br>v.<br><br>SPORTICO MEDIA, LLC and DANIEL LIBIT<br><br>Defendants. | kg |

**MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER**

Pursuant to Rule 4(c) of the Massachusetts Rules of Civil Procedure, Plaintiffs The Giving Back Fund, Inc. and Marc Pollick respectfully move that the Court appoint One Source Process as special process servers for the purpose of serving Defendants and/or counsel the summons and complaint and all other process in this action. Plaintiffs state that said process servers are disinterested parties and over the age of 18.

NOTICE SENT
06.10.26

6/8/26 Allowed

Date Filed 6/4/2026 6:25 PM
Superior Court - Suffolk
Docket Number

Respectfully submitted,

Plaintiff,

THE GIVING BACK FUND, INC., and MARC POLLICK,

By its attorneys,

*/s/ Howard M. Cooper*
Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Maria T. Davis (BBO # 675447)
mdavis@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel: (617) 720-2626
Fax: (617) 227-5777

I HEREBY ATTEST AND CERTIFY ON July 27, 2026, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Dated: June 4, 2026

CK



COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPT.
OF THE TRIAL COURT
No. 2684CV01663

THE GIVING BACK FUND, INC. and MARC POLLICK,

Plaintiffs,

v.

SPORTICO MEDIA, LLC and DANIEL LIBIT,

Defendants.

**ACKNOWLEDGEMENT AND WAIVER OF SERVICE OF SUMMONS AND COMPLAINT IN ACCORDANCE WITH MASS. R. CIV. P. 4**

As counsel for defendants, Sportico Media, LLC and Daniel Libit, I agree to waive service of process and accept electronic copies of the Summons and Complaint on behalf of the defendants in this action. Further, I acknowledge that I received electronic copies of the Summons, Civil Action Cover Sheet, Complaint and Jury Demand and Civil Tracking Order on the defendants' behalf on June 22, 2026. Defendants waive any defense of insufficiency of process or insufficiency of service of process, and reserve all other defenses.

/s/ *Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO #647438)
Prince Lobel Tye LLP
One International Place, Suite 3700
Boston, MA 02110
(617) 456-8000
jpyle@princelobel.com

Dated: June 23, 2026

I HEREBY ATTEST AND CERTIFY ON July 27, 2026, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

#6298135v1

## CERTIFICATE OF SERVICE

I, Howard M. Cooper, hereby certify that a true copy of the foregoing document was served upon counsel of record via electronic mail on July 1, 2026.

Jeffrey J. Pyle, Esq.
Prince Lobel Tye LLP
One International Place, Suite 3700
Boston, MA 02110
jpyle@princelobel.com

*/s/ Howard M. Cooper*
Howard M. Cooper

| Summons | CIVIL DOCKET NO. 2684CV01663 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: | |
|---|---|
| The Giving Back Fund, Inc. et al Plaintiff(s) vs. Sportico Media, LLC et al Defendant(s) | John E. Powers III, Clerk of Courts, Suffolk County<br>COURT NAME & ADDRESS:<br>Suffolk Superior Civil Court<br>Three Pemberton Square<br>Boston, MA. 02108 |

**THIS SUMMONS IS DIRECTED TO** Sportico Media, LLC **(Defendant's name)**

**You are being sued. The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the** Suffolk Superior **Court.**

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court <u>and</u> mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your signed original response with the Clerk's Office for Civil Business, Suffolk Superior Court Three Pemberton Square Boston, MA 02108 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, <u>AND</u>

b) Delivering or mailing a copy of your response to the Plaintiff's attorney/Plaintiff at the following address: Todd & Weld LLP, Attn: Howard Cooper, One Federal Street, Boston, MA 02110

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must specifically request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Rule 12 of the Massachusetts Rules of Civil Procedure. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. Required Information on All Filings.

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Michael D. Ricciuti, Chief Justice on June 15, 2026. (Seal)

Clerk [signature]

Note: The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

PROOF OF SERVICE OF PROCESS

I hereby certify that on ______________, I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

______________________________________________

______________________________________________

______________________________________________

Dated: ______________ Signature: ______________

N.B. TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date:

| Summons | CIVIL DOCKET NO. 2684CV01663 | **Trial Court of Massachusetts** **The Superior Court** |
|---|---|---|
| CASE NAME: The Giving Back Fund, Inc. et al Plaintiff(s) vs. Sportico Media, LLC et al Defendant(s) | | John E. Powers III, Clerk of Courts, Suffolk County. COURT NAME & ADDRESS: Suffolk Superior Civil Court, Three Pemberton Square, Boston, MA. 02108 |

THIS SUMMONS IS DIRECTED TO Daniel Libit (Defendant's name)

**You are being sued. The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Suffolk Superior Court.**

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court <u>and</u> mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your signed original response with the Clerk's Office for Civil Business, Suffolk Superior Court Three Pemberton Square Boston, MA 02108 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, <u>AND</u>

b) Delivering or mailing a copy of your response to the Plaintiff's attorney/Plaintiff at the following address: Todd & Weld LLP, Attn: Howard Cooper, One Federal Street, Boston, MA 02110

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must specifically request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure**. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Michael D. Ricciuti, Chief Justice on June 15, 2026. (Seal)

Clerk [signature]

Note: The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

## PROOF OF SERVICE OF PROCESS

I hereby certify that on ______________, I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

______________________________________________

______________________________________________

______________________________________________

Dated: ______________ Signature: ______________________

**N.B. TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

MS

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPT.
OF THE TRIAL COURT

THE GIVING BACK FUND, INC. and MARC POLLICK

Plaintiffs,

v.

SPORTICO MEDIA, LLC and DANIEL LIBIT

Defendants.

CIVIL ACTION NO. 2684CV01663

# AMENDED COMPLAINT AND JURY DEMAND

## i. Introduction

1. Plaintiffs, The Giving Back Fund, Inc. ("GBF") and its President and Founder Marc Pollick ("Mr. Pollick") (together "Plaintiffs"), bring this action for, *inter alia,* defamation and tortious interference with advantageous business relations against Defendants, Sportico Media, LLC ("Sportico") and Daniel Libit ("Mr. Libit") (together "Defendants"). Plaintiffs seek to recover damages necessary to make them whole for the substantial harm Defendants caused them as a result of Defendants' publication in bad faith, negligently and/or with a knowing or reckless disregard of the truth, numerous false and defamatory lies concerning Plaintiffs, and injunctive relief requiring Defendants to immediately remove and cease dissemination of the articles. GBF is a non-profit, charitable organization which has been led by Mr. Pollick since its inception in 1997. Until Defendants undertook their unlawful defamation campaign, both GBF and Mr. Pollick had long enjoyed hard-earned and well-deserved stellar reputations. Defendants'

lies, including their lies about Plaintiffs' important charitable endeavors, unlawfully and substantially damaged Plaintiffs' reputations and caused other injuries. Defendants are liable for damages for their wrongdoing and the harm they caused.

### ii. Parties

2. Plaintiff GBF is a Massachusetts nonprofit corporation with a principal place of business located at 500 Commercial Street in Boston, Suffolk County, Massachusetts. As a Massachusetts based non-profit, GBF is subject to oversight within the Commonwealth.

3. Plaintiff Mr. Pollick is an individual and the founder and President of GBF.

4. Defendant Sportico is a Delaware corporation with a principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, California 90064. At all times relevant hereto, including during much of its unlawful defamation campaign, Sportico was registered to do business in the Commonwealth.

5. Defendant Mr. Libit is an individual who upon information and belief resides in Chicago, Illinois. Mr. Libit regularly publishes pieces he authors into the Commonwealth including the defamatory publications at issue here.

### iii. Jurisdiction and Venue

6. The exercise of personal jurisdiction over Sportico and Mr. Libit is lawful and proper where Defendants published their false and defamatory statements attacking Plaintiffs on the Sportico digital platform by which Defendants intended to and did in fact reach audiences in Massachusetts. Defendants knowingly published into Massachusetts, knowingly solicited individuals in Massachusetts for Defendants' false and defamatory stories, and were fully aware that their false and defamatory statements would cause injury to Plaintiffs here.

7. Venue is lawful and proper in Suffolk County because Defendants' false and defamatory statements caused injury to Plaintiffs here and because GBF is a Massachusetts public charity.

## iv. Facts

### About The Giving Back Fund and Mr. Pollick

8. Mr. Pollick founded GBF in 1997 with the goal of helping professional athletes, celebrities, high-net-worth individuals, corporations, and others establish and maintain charitable foundations according to best practices in philanthropy.

9. GBF is a non-profit organization that provides philanthropic consulting, management and administrative services to donors. Among many other things, GBF strives to and succeeds in helping its donors make the greatest charitable impact possible.

10. GBF's commitment to its mission and to its donors has been a success. Over nearly three decades, GBF has launched and assisted more than 1,000 foundations and other charitable entities. It has facilitated more than one billion dollars in donations and grants to thousands of causes across the world.

11. GBF has supported causes including, without limitation, researching cures for numerous diseases, treatment of mental health disorders, earthquake relief, education for women and girls in Africa, scholarships, fighting discrimination, and hundreds of other important causes.

12. GBF has had the opportunity to work with funds established by individuals including Yao Ming, Doug Flutie, Jim Brown, Pelé, Steve Gleason, Jalen Rose, Magic Johnson, Damar Hamlin, Britney Spears, Justin Timberlake, and Cara Delevingne, among hundreds of other well-known and prominent individuals.

13. GBF continues to work tirelessly in pursuit of its mission to expand the number of people and the amount of resources dedicated to charitable giving.

14. One of the ways in which GBF works to carry out its mission is by hosting events to raise funds for charities. GBF's signature event, held every year between 2009 and 2024 (other than when affected by Covid), has been the "Big Game Big Give" ("BGBG") event held during the week of the Super Bowl.

15. The BGBG is hosted by celebrities who volunteer their participation in exchange for a contribution to the celebrity host's chosen charity. The event has raised over $11 million dollars and benefited numerous charities around the country. Celebrities including, without limitation, Michael Bay, Jamie Foxx, Mark Wahlberg, Joe Montana, Rob Lowe, Jay Leno, Ashton Kutcher and Demi Moore, Alec Baldwin, Hilary Swank, David Schwimmer, Michael Phelps, and The Black Eyed Peas have hosted the event in the past. Sponsors of the BGBG have included J.P. Morgan, Goldman Sachs, AOL, Aston Martin, BMW, Lamborghini, USA Today, and Forbes, among other well-known companies.

16. GBF produces its BGBG event (and others) on a relatively modest budget and relies on the significant donations of others to put on the event. GBF's BGBG event consistently has been viewed as a spectacular success and is repeatedly attended by many of the same guests, donors, and participants. Director Michael Bay has hosted it without charge four times, as has Academy Award Winner Jamie Foxx. There have been more than 1000 articles and news media coverages of the event praising its success and impact. In just the BGBG's second year, ESPN The Magazine named it the Number One event of Super Bowl week.

17. While GBF's reach is international, it is a Massachusetts charitable organization based in Boston. Since its inception, its employees and past and present board members have

included numerous respected members of the Massachusetts community. At the time Sportico wrote its articles about GBF, GBF's board Chair was Prashanth Palakurthi and its Chief of Staff was Ingrid Tucker, both Massachusetts residents. Its board included other Massachusetts residents, including Alan Dershowitz, Arnold Hiatt, Charles Ogletree, Paul Weiler, Prof. Stephen Greyser, Steve Grossman, Jonathan Kozol, Joyce Kulhawik, Rabbi Harold Kushner, Paul Schervish, Michele Courton-Brown, and John Morton.

## About Sportico

18. Penske Media Corporation is a global media conglomerate ("Penske Media"). Penske Media launched Sportico in 2020. Sportico styles itself as a media news platform and professes on its website to be "the premier destination for professionals and informed readers seeking authoritative news and analysis on the $500 billion global sports industry." Sportico further touts itself as providing news and analysis "covering every facet of the business of sports" through its "robust digital platform, newsletters, and live events." In fact, Sportico is a sensationalistic outlet willing to knowingly publish falsehoods as alleged herein in order to increase its audience.

19. Sportico's digital business model includes its digital advertising strategy that depends on generating web traffic, including online traffic from Massachusetts visitors. Sportico also earns revenue through soliciting subscription fees for users, including Massachusetts consumers, who must pay in order to gain access to articles placed behind paywalls on Sportico's platform.

## Sportico and Mr. Libit's Defamation of GBF and Mr. Pollick

20. In or about 2023, Sportico and Mr. Libit conceived of and began a months long defamation campaign targeted at GBF and its founder, Mr. Pollick. Defendants did so relying

upon obvious unreliable and biased sources, unreliable and false information, and by purposefully avoiding or minimizing truthful information that did not fit their preconceived agenda. As one example only, as a result of Defendants' publication of their first defamatory story, GBF commissioned an independent investigation by a prominent Boston law firm into various allegations that were published by Sportico taken from a purported "whistleblower" letter Sportico had received without the knowledge or permission of its author. The results of that investigation completely exonerated Mr. Pollick of every allegation against him. Rather than report that Mr. Pollick had been exonerated, however, Defendants fabricated a bold headline publishing the opposite in yet a second defamatory article and continued to report on the already investigated and disproven facts, all in an effort to harm GBF and Mr. Pollick. Importantly, the investigation was conducted by Boston, Massachusetts based legal counsel. Defendants communicated with Boston counsel in the course of creating their false and defamatory publication.

21. Sportico and Mr. Libit published numerous damaging false and defamatory statements of alleged fact regarding both GBF and Mr. Pollick, some of which were knowingly and recklessly fabricated or which were published negligently. Worse, Sportico and Mr. Libit continued to publish in blatant disregard of the actual facts after the actual facts were provided to them.

22. Upon information and belief, there were two main sources for Defendants' information. The first, upon information and belief, was a known and obviously disgruntled former professional whom GBF had terminated its relationship with, whose bias was clear from publicly available sources including a lawsuit, and who had threatened GBF and Mr. Pollick in writing for having terminated him. The second, upon information and belief, was a disgruntled

former GBF board member who had been asked to step down from the board for cause and resigned only when faced with a board meeting specifically called to vote on whether to remove her from the board for cause, where all board members were expected to vote for her removal.

23. Some of the specific false and misleading allegations in Defendants' three (3) articles are set forth below, without limitation.

24. As is well known, GBF is an extremely well-run and effective charity. Over the past 29 years, under Mr. Pollick's leadership, GBF has created more than 1,000 foundations all over the world and has facilitated the distribution of more than *one billion dollars* to people in desperate need. GBF's taxes are prepared annually by national CPA firms, and its financial reports have passed their carefully audited inspections for 29 consecutive years. *Not once*, until the appearance of Defendants' false and defamatory articles, has anybody accused Mr. Pollick of having been dishonest, or of having engaged in fraud, financial wrongdoing, employee harassment, or any other nefarious conduct whatsoever. To the contrary, all prior reporting on GBF and Mr. Pollick over the past three decades—including hundreds of magazine and newspaper articles—have lauded GBF and Mr. Pollick's tireless work for charities and people in need.

25. On May 1, 2023, Sportico and Mr. Libit published its first article written by Mr. Libit. Defendants published this article under the false and defamatory headline "**Damar Hamlin's Charity Sponsor, the Giving Back Fund, Embroiled in Strife.**" Defendants published their article on the Sportico website, www.sportico.com/business/sports/2023/damar-hamlin-charity-sponsor-giving-back-fund-1234721053/. The headline was false and defamatory and known by Defendants to be false and defamatory. Defendants published the article into Massachusetts.

26. In their article, Mr. Libit and Sportico knowingly made numerous false statements regarding GBF and Mr. Pollick in order to falsely portray GBF as "an organization in strife and falling short of its sterling reputation[,]" with Mr. Pollick falsely portrayed as "the primary source of discontent." Defendants also reported false statements made almost exclusively anonymously by people who would not go on the record. Defendants made these false statements without speaking to anyone on the current GBF board except its Chairman, Mr. Palakurthi, who vigorous defended Mr. Pollick and expressed his, and the board's, full confidence in Mr. Pollick's leadership, and without speaking to the many GBF clients who would have told Sportico a very different story.

27. Incredibly, Mr. Libit did so by affirmatively reaching out to former GBF employees, including those living in Massachusetts, not just to ask for objective information as a reporter would normally do, but under the cover of an initial written communication promising anonymity for anyone willing to respond. Upon information and belief, Mr. Libit reached out almost exclusively to former employees who had been terminated and who he was told were aggrieved. Defendants' actions in this regard were an extraordinary departure from normal and acceptable journalism. Indeed, offering a possible source anonymity before ever speaking with them is direct evidence of actual malice in that it is a reckless invitation to entertain specious information by making clear to the source they will not face any consequences in providing it.

28. Specifically, Mr. Libit's message to those former employees receiving his communication stated:

> I am a reporter for Sportico, the sports business publication, working on a story about the Giving Back Fund. I've heard from sources about a lot of turmoil and issues within the organization. Hoping to confirm/learn some things from you. Happy to grant you anonymity, as I have with other sources. Please message or call me at your earliest convenience.

A copy of his message is attached as ***Exhibit A***.

29. Mr. Libit's communication also establishes Defendants' pre-conceived agenda of soliciting information only from former employees—employees who, on information and belief had been terminated and likely to be disgruntled—whom he hoped, given the promised anonymity, would report turmoil in exchange for no accountability for their statements.

30. Defendants' knowingly false statements in the first article which are at issue here include but are not limited to the following:

a. Defendants falsely reported that GBF's "2021 tax return's statement of functional expenses contained numerous empty categories on line items such as legal, accounting and benefits paid to current top employees. These had previously been filled out in earlier returns. The organization reported spending about $3.4 million on "professional fees" in 2021, yet included no names in the section of the tax return for independent contractors earning at least $100,000." These statements were false, omit material information, and are misleading, as Defendants knew. GBF's tax returns have been prepared by reputable national firms and approved by its long-time certified public accountant, board, treasurer, and finance committee. GBF's tax returns have also passed 28 consecutive outside audits without ever receiving a single management letter.

b. Defendants falsely reported that "[m]ultiple staffers and former clients say it has been a common occurrence for earmarked donations to be initially placed in the wrong accounts." This statement was false and misleading, as Defendants knew. While donations often arrive at GBF with no designation, GBF is scrupulous in reaching out to track down each donor to ensure that their donation, often made anonymously, is credited to the exact foundation for which it was intended.

c. Defendants falsely reported that "[w]hile touting itself as 'more than a fiscal sponsor,' former employees say GBF has long struggled to carry out the basic functions of a fiscal sponsor: depositing charitable contributions, keeping track of the money and providing solicitation notices to donors. Even the job of reconciling client accounts has proven to be an ever-elusive challenge. Of the 168 accounts that GBF had on its books last summer, only a third were considered 'in good standing,' internal documents show." These statements were false and based on a misinterpretation of internal records that Defendants improperly sourced, as Defendants knew. GBF has been responsible for over 1,000 foundations, each of which required and received proper financial management.

d. Defendants falsely reported that "[m]any clients had to fight for a long time,' one former employee said. 'Most of them that I have seen ended up reaching some sort of compromise where they leave a lot of money at the Giving Back Fund.'" This statement was false, as Defendants knew. No client has ever had to fight for their money and no client has ever "left a lot of money" at GBF.

e. Defendants falsely reported that "[o]n the other end of the spectrum are clients like the Yao Ming Foundation, which multiple staffers say has effectively operated as a dormant GBF project for the last decade, while still shelling out some of the highest client fees. Yao's charity, launched in 2008 as a response to the deadly Sichuan earthquake, had been paying GBF $5,000 a month through mid-2021, when its fee was cut to $4,000 a month. (Messages left with Yao's agency, WME, did not receive a response.)." This statement was false and misleading, as Defendants knew. Mr. Ming's foundation is not dormant and receives significant donations every year and has made and received hundreds of thousands of dollars in grants in recent years.

f. Defendants falsely reported a "whistleblower's" statement that Mr. Pollick "had been barred from renting vehicles through Hertz because of a long-ago surcharge for damaging a rental vehicle that he wouldn't make good on." This statement was false as Defendants knew and were told in advance of publication. A Hertz representative collected the car from Mr. Pollick after a tire went flat and returned it to the wrong Hertz location. Hertz thought that it was Mr. Pollick who had returned the car to the wrong location and thus erroneously added a fee to his bill. The error was corrected and Mr. Pollick was not charged and in fact owed nothing.

g. Defendants falsely reported the whistleblower's statement that in order to cancel airfare without a charge, Mr. Pollick would "sometimes l[ie] to say he had Covid" and that they were "not comfortable lying for him, so he would have me patch him in after waiting on hold. I booked and canceled the same pre-BGBG trip for him around 5 separate times." This statement was false, as Defendants knew. Mr. Pollick never lied to cancel or reschedule anything and only canceled trips when the client he was traveling to visit asked to reschedule.

h. Defendants falsely reported that the whistleblower had reported "[e]mployees are scared of [Mr. Pollick's] retribution," and falsely reported that the same sentiment was "echoed by each of the two dozen former staffers who spoke to Sportico." This statement was false, as Defendants knew or should have known. Mr. Pollick has never taken "retribution" against any employee at any time, has not threatened to do so, has not been reported as doing so, and employees are not "scared" of him. This statement by Defendants is false.

i. Defendants falsely reported that GBF board member Joanne Pasternack quit the board and that her departure "closely followed those of two other directors, Danny Hughes and Keeley Mooneyhan." These statements were false and misleading. Ms. Pasternack resigned only when faced with a Board Meeting specifically called to vote on whether to remove her from the board for cause, where all board members were expected to vote for her removal. At that time Ms. Pasternack had already been asked to step down twice and did not willingly "quit." Mr. Hughes left, after Ms. Pasternack and not before, simply because his board term was over. Ms. Mooneyhan had left eight months before Ms. Pasternak because she had lost her job. Defendants' insinuation that there was a resignation of multiple board members *en masse* reflected a broader concern and was therefore false and misleading.

j. Defendants negligently and/or with actual malice reported that GBF's "[i]nternal documents also showed that in April 2020, GBF reimbursed NEXUS for a $41,800 payment it made to Spark Neuro, the company owned by the husband of NEXUS co-founder Rachel Gerrol, to rent office space in New York City. Former employees say they were troubled by what they perceived as a potential conflict of interest, but that it didn't matter." This statement was false, misleading, and omitted material information, as Defendants knew and were told in advance of publication. Ms. Gerrol's husband had given NEXUS office space at a substantial discount to save NEXUS, a charity, money. There was no potential conflict or any mismanagement of funds. To the contrary, thousands of dollars were saved.

k. Defendants falsely reported that "Pollick's exhaustive list of personae non gratae includes some of his once-closest confidants." This statement was false, as Defendants knew. Mr. Pollick did not have an exhaustive list of personae non gratae including some of his once-closest confidants and the only example Defendants provided was a lawyer whom GBF sued and settled against based on his breach of duties to GBF.

l. Defendants falsely reported, after making a series of false and defamatory statements, "And yet, Pollick's public image has endured unscathed[,]" implying that there would be a reason for Mr. Pollick's reputation to have been harmed. This statement was false and misleading, as Defendants knew. As set forth above, Mr. Pollick has successfully led GBF for 29 years, has created more than 1,000 foundations all over the world, and has facilitated the distribution of more than one billion dollars. He has never been accused of or found to have been dishonest, of having engaged in fraud, having engaged in employee harassment, or having conducted any other form of criminal wrongdoing.

m. Defendants falsely reported that "[i]n 2002, the Giving Back Fund made headlines when it filed a $15 million lawsuit against Britney Spears' former lawyer, Mark Steverson, following the pop star's decision to end her relationship with the GBF[,]" implying that GBF's lawsuit was motivated by Ms. Spears' decision to leave GBF. This statement was false, misleading, and omits material information, as Defendants knew. The lawsuit was based on the insistence of Mr. Steverson, who was a GBF board member, on using charitable funds for non-charitable purposes. GBF's board voted 14-0 to remove Mr. Stevenson as a board member and brought a publicly accessible lawsuit against him for breach of fiduciary duty and breach of loyalty. The case was settled almost immediately in favor of GBF.

n. Defendants falsely reported that its source was a "whistleblower letter," implying that the individual writing the letter had acted at their own risk to call out wrongdoing by GBF. This statement was false, misleading, and omits material information. The employee Defendants dubbed a "whistleblower" was terminated after being found to have engaged in malfeasance through the investigation of an independent outside law firm. That investigation also showed that the allegations in the letter were false. As set forth below, Sportico obtained this letter without the permission of the author and without the author's knowledge. The individual identified as the whistleblower

refused to confirm that they had written the letter during the investigation, has since withdrawn the allegations in their letter, and demanded that Sportico remove all references to the letter and any content contained in the letter.

o. Defendants falsely reported "[b]ut that is not the full story that emerges from interviews with dozens of sources—including clients, donors, contractors, board members and 24 former GBF employees—as well as a review of hundreds of pages of internal documents. Collectively, they portray an organization struggling to carry out basic oversight and accounting functions, and steeped in fear of its leader." This statement is false, misleading, and omits material information, as Defendants knew or should have known. Defendants implied they had significant sources that supported their false claim but only reported on limited sources whose narratives fit their story. Defendants omitted or did not seek information from numerous individuals from the 29-year-old GBF who would have truthfully and vigorously supported GBF and Mr. Pollick.

p. Defendants falsely reported a statement from Lisa Greer, who falsely reported that "at Pollick's solicitation, joined GBF's board as its president in 2021 before quitting three months later." Defendants also published the false statement from Ms. Greer "I encountered a great deal of resistance and great deal of anger with just trying to help the organization." These statements were false, misleading, and omitted material information, as Defendants knew or should have known. Ms. Greer was recruited as GBF's Chair (and not president), a role in which she served for only three months before she was asked to resign for improper conduct. Ms. Greer's opinion was not representative of GBF's other board members and employees, many of whom were longstanding board members and employees.

q. Defendants falsely reported that a sign of strife was that GBF had a falling out with its longtime counsel, Andrew Morton. These statements were false and misleading, as Defendants knew. Attorney Morton was not a longtime counsel, was not on retainer with GBF, and was solely consulted from time to time on minor legal matters.

r. Defendants falsely reported that Attorney Morton "delivered a number of his athlete clients to the organization." This statement is false, as Defendants knew or should have known. Attorney Morton never delivered any client to GBF.

s. Defendants falsely reported "But GBF—having shuffled through several compliance companies over the last year—had been delinquent with its charity registrations in multiple states, according to multiple sources familiar with the situation." This statement is false and misleading, as Defendants knew or should have known. GBF did not "shuffle" through several compliance companies, it sought a new company when its long term compliance company was no longer suitable and its first replacement was not a good fit for GBF. GBF retained its current firm which brought GBF compliant that same day.

t. Defendants falsely reported that "[e]arlier this year, Pollick settled a three-year-old lawsuit he filed against the Diplomat Beach Resort in Hollywood, Fla., which he

originally sued for injuries and lost wages he claimed he suffered after colliding with a sliding glass door while staying at the hotel in 2019. At the time, Pollick was in Florida scouting a location for an upcoming Big Game Big Give party. Pollick, who receives an annual salary of around $250,000, eventually dropped his lost-wages claim, which could have required him to submit to discovery related to GBF's business." This statement is false and misleading, as Defendants knew, because it implied that Mr. Pollick dismissed his lost wages claim to avoid having to produce discovery related to GBF's business. There is no factual basis for this implication.

u. Defendants falsely reported that "Pollick's on-the-fly desire to sign up new clients led to a capricious fee structure, the former staffers say." This statement is false, as Defendants knew or should have known. Mr. Pollick did not and does not set client fees. Fees are set by the leadership team as a whole, through consensus.

31. Many of the statements in the May 1, 2023 article were attributed to a letter written by a purported whistleblower, (the "Complaining Employee"), which was sent to a GBF board member, Joanne Pasternack. Around this same time, GBF's board had demanded that Ms. Pasternack step down from the board based upon her misconduct. Ms. Pasternack initially refused to do so. Ultimately, she was allowed to resign when faced with a board meeting specifically called to vote on whether or not to remove her from the board for cause—a vote in which all board members had agreed to unanimously vote for her removal.

32. As Defendants also well knew prior to publication, the supposed whistleblower was in fact a disgruntled employee who had recently been demoted for poor performance. That Complaining Employee, while providing their letter to Ms. Pasternack, never authorized their letter to be disseminated to Mr. Libit, Sportico, or any other media entity, and since Defendants' original defamatory publication has disavowed their letter and demanded Defendants withdraw it. Defendants have ignored their request and continue through today to publish their defamatory article about it.

33. Mr. Libit did not have any support for the statements in the Complaining Employee's letter and nothing in the letter indicated that the Complaining Employee's statements were credible. Nonetheless, Mr. Libit relied on the statements, without obtaining valid support,

in order to write a spurious article about GBF and Mr. Pollick—despite GBF advising Mr. Libit prior to publication that many of the statements in the letter were false.

34. On May 27, 2026, the Complaining Employee wrote to tell Mr. Libit and Sportico not only that they had not been authorized to obtain and rely on the letter, *but that they did not have first-hand knowledge of the information communicated and that allegations in the letter were incorrect, exaggerated and/or without basis in fact.*

35. Specifically, the Complaining Employee wrote:

> My name is [Complaining Employee]. It has come to my attention that you published in Sportico a letter I wrote to my then-employer, The Giving Back Fund, Inc., regarding that company and its CEO, Marc Pollick. I also understand that in your articles you quoted my letter and made repeated references to it.
>
> ***Please be advised that I did not give Sportico or Mr. Libit permission to use my letter, or to publish my letter, or to quote or reference my letter in the articles. I still do not give any such permissions to Sportico or Mr. Libit. Further, I did not send my letter to Sportico, nor did I give anyone permission to send my letter to Sportico.*** That letter was intended to be confidential to the addressees. In fact, in the course of writing these articles Mr. Libit reached out to me and I specifically informed him that I declined to be involved in any way.
>
> Further, please be advised that ***there were certain allegations in my letter which were incorrect, exaggerated and/or for which I did not have facts to base them***. I regret writing that letter in that form because of this. If I could turn back the clock, I would not have submitted that letter in that form.
>
> I cannot turn back the clock, of course, but to fix any problems I may have inadvertently caused ***I wish for Sportico to promptly remove my letter from its website and from its articles, to remove any quotations Sportico may have used from my letter, and to remove any references to my letter from the Sportico website and its articles***. I reserve all rights, but at a minimum please abide by my request herein.

(Emphasis added). A copy of the Complaining Employee's letter is attached at ***Exhibit B***.

36. Nonetheless, despite this direct and unambiguous warning about falsity, Defendants have continued to publish their defamatory articles.

37. As set forth above, following Sportico and Mr. Libit's dissemination of the May 2023 article, at Mr. Pollick's request, GBF's board hired an independent Boston law firm, Rubin and Rudman LLP ("Rubin & Rudman"), to investigate the Complaining Employee's complaints, specifically, whether Mr. Pollick had acted in an illegal, unethical, inappropriate and unprofessional manner as alleged in Defendants' publication.

38. During the course of its investigation, Rubin & Rudman examined documents, interviewed GBF leadership, board members, and employees, including the Complaining Employee, and consulted with an executive coach.

39. Following completion of the investigation, Rubin & Rudman determined that the Complaining Employee's allegations were not substantiated and that "[a] review of various issues in their entirety concluded the lack of any improper action." Rubin & Rudman determined:

> [T]here is no substantiation to the allegations raised by [the Complaining Employee] against the [Mr. Pollick]. As such, there is no recommendation being made for disciplinary action against [Mr. Pollick]. Removal of ["Mr. Pollick"] from his position is not warranted or any other similar actions.

40. Rubin & Rudman further determined that it was appropriate for GBF to discipline the Complaining Employee, up to and including termination.

41. GBF terminated the Complaining Employee based on misconduct.

42. Despite Rubin & Rudman having exonerated Mr. Pollick of any wrongdoing whatsoever, and determining that termination of the Complaining Employee was proper and warranted, Sportico and Mr. Libit decided to write and disseminate a second false and defamatory hit piece about Mr. Pollick and GBF—including repeating the false statements contained in the already disproven letter.

43. Specifically, on July 11, 2023, Sportico and Mr. Libit published their second article, also written by Mr. Libit, falsely headlined "**Giving Back Fund Investigates CEO, Fires Whistleblower**" on its website, www.sportico.com/business/sports/2023/giving-back-fund-investigation-ceo-whistleblower-1234730092/.

44. Prior to publishing the article, Mr. Libit and Sportico emailed GBF to request information regarding topics addressed in the article. GBF and the Boston-based lawyer who conducted the internal investigation of GBF, Attorney Alfred Gray, responded fully to those questions.

45. Mr. Libit also reached out to Massachusetts-based GBF board chair Mr. Palakurthi and Massachusetts-based Chief of Staff Ms. Tucker.

46. Defendants' headline alone is both outrageous and defamatory per se. It communicates the opposite of the truth by informing readers falsely that Mr. Pollick was under investigation, when in fact it was Mr. Pollick himself who had requested the investigation, and that in response he had fired the alleged whistleblower. Significantly, prior to the article being written, the investigation had already been completed. It is well-established that many readers never read beyond the headline and, upon information and belief, Defendants used the false and defamatory headline as click bait in an effort to draw readers to their site through a sensationalized headline and to further defame Mr. Pollick and GBF. This too is actual malice.

47. In the second article, Mr. Libit and Sportico again made numerous false statements regarding GBF and Mr. Pollick and reported on the false statements of others without properly validating the statements.

48. Defendants' false statements in the second article at issue here include but are not limited to the following:

a. Defendants' headline for the article was itself false and misleading. The title implies that GBF conducted its own investigation, which was ongoing, and fired an individual in retaliation for their proper reporting of misconduct. This statement was false and misleading, as Defendants knew. GBF hired Rubin & Rudman LLP, an independent and respected law firm, to investigate the administrative assistant's complaints regarding GBF and Mr. Pollick. The investigation was already complete when the article was released and established that neither GBF nor Mr. Pollick had committed any wrongdoing. Further, the employee was terminated for misconduct.

b. Defendants falsely reported that "[t]he employee who spoke up, however, was dismissed." This statement was false, misleading, omitted material information, as Defendants knew, and implied that the employee spoke up to raise legitimate concerns and was wrongly terminated. No employee "spoke up" of any material wrongdoing and no GBF employee was ever dismissed because they made a complaint. The employee was properly terminated for performance issues and misconduct. Here, the employee at issue was terminated because of the reasons stated above, not because of any protected activity.

c. Defendants falsely reported that "[w]hat emerged was a behind-the-scenes picture of an organization that, despite its four-star [Charity Navigator Rating], has long struggled to carry out some of the basic functions of a philanthropic fiscal sponsor, often promises more than it can deliver and is routinely impaired by the combative and wayward tendencies of its leader." These statements were false and defamatory, as Defendants knew or should have known. As set forth above, GBF was and is a successful organization and owes much of its success to Mr. Pollick's dedication, leadership, and ability to attract and work with clients, charities, donors, and highly respected and prominent board members and advisory board members, many of whom have served proudly for more than 25 years.

d. Defendants falsely reported that "[t]he upshot of the investigation appears to maintain the status quo, with Pollick having weathered it without so much as a slap on the wrist." These statements were false, misleading, show bias and malice, and omitted material information, as Defendants knew, and implied that Mr. Pollick deserved to be punished. The investigation resulted in no punishment for Mr. Pollick because Mr. Pollick was cleared of all wrongdoing by the investigation and there was no reason to punish him.

e. Defendants falsely reported that "Pollick remained, but within a year, most of those board members had quit, one of many exoduses of staff or directors at GBF." This statement was false, as Defendants knew, and wrongfully implied that individuals fled GBF because of GBF or Mr. Pollick's conduct. Over the years, GBF has had to ask certain members of the board to step down when their goals or motives did not align with GBF, but there has never been an exodus of staff or directors.

f. Defendants falsely reported that "[a] recent outside investigation into a whistleblower's complaints against the head of the Giving Back Fund, the fiscal sponsor for Damar Hamlin . . . and other pro athlete charities, resulted in no

punishment for the executive." This statement was false, misleading, omitted material information, as Defendants knew, and implied that Mr. Pollick deserved to be punished. The investigation resulted in no punishment for Mr. Pollick because Mr. Pollick was cleared of all wrongdoing by the investigation and there was no reason to punish him. Defendants, who repeatedly referenced the investigation in the article, were aware that the investigation had concluded and that Mr. Pollick had been cleared of any and all wrongdoing.

g. Defendants falsely reported that "[i]n her resignation, [Ms. Pasternack] had recommended that GBF's board do a 12-point, top-down review of the organization, from its finances to various critical postings that had been made over the years on employment websites like Glassdoor and Indeed." This statement was false and misleading, as Defendants knew, because it wrongly implied that Ms. Pasternack made the decision to resign on her own. As set forth above, Ms. Pasternack resigned only when faced with a board meeting specifically called to vote on whether or not to remove her from the board for cause, where all board members were expected to vote for her removal. At that time Ms. Pasternack had already been asked to step down twice.

49. Moreover, many of the false statements set forth above were directly contradicted by Mr. Pollick's and GBF's written responses to Mr. Libit and Sportico who then disregarded those statements entirely. As examples only:

a. Mr. Libit wrote to GBF:

> As I understand, in late May, GBF's board retained an outside law firm to investigate the allegations [the Complaining Employee] raised in his whistleblower letter(s) to the board. As such, I was told that [the Complaining Employee] was put on paid leave pending the results of the investigation. It is my understanding that the investigation has since concluded. Can you provide me any on-the-record statement about the investigation, its breadth of focus, and its status?

Attorney Gray, of Rubin and Rudman responded:

> Rubin and Rudman was retained by The Giving Back Fund Board to conduct an investigation solely with regard to the specific allegations raised in [the Complaining Employee's] letter to the Board of Directors. We reviewed dozens of documents and interviewed involved staff over a five-week period. The findings of our investigation do not substantiate the allegations that were raised in the letter. Many of the issues set forth in the letter consisted of only a portion of the referenced situations. ***Looking at the issues in their entirety, a conclusion was reached that there was no illegal, unethical or improper action with regard to the issues raised.*** The investigation concluded that despite the allegations not being substantiated that [the Complaining Employee] filed the letter to the Board

> in good faith. However, the investigation also concluded that [the Complaining Employee] engaged in various other forms of activity which would be sufficient to warrant GBF to take actions, including disciplinary action, consistent with its policies and procedures.

(emphasis in original). While Mr. Libit included limited portions of Attorney Gray's statement, he did not include detail that showed the depth of Rubin & Rudman's extensive investigation.

b. Mr. Libit wrote to GBF:

> I was told that [the Complaining Employee] was fired last Friday. Was the termination related in any way to the original complaints [the Complaining Employee] raised about Marc Pollick, or anything to do with the subsequent investigation?

Mr. Pollick and GBF responded:

> Their termination was not related in any way to the original letter [the Complaining Employee] sent to the Board. [The Complaining Employee] had already received warnings about work performance and potentially fireable offenses long before the letter. The investigation of the claims made in the letter unfortunately validated and confirmed egregious and unlawful actions by this employee and recommended they be terminated.

Mr. Libit and Sportico did not include any of these details in the July 11, 2023 article.

c. Mr. Libit wrote to GBF:

> It is my understanding that the staff was informed in an emergency meeting last Friday about [the Complaining Employee's] departure. I heard that during that meeting, leadership indicated that they had yet to receive the final report from the outside investigation, but that Marc then interjected to say that he had a copy of the report. Is that accurate?

Mr. Pollick and GBF responded:

> Yes. The report was directed only to me and to the Board chair. It was not directed to other leadership. The investigation conducted by independent law firm Rubin and Rudman over the course of five weeks confirmed two major findings – egregious and unlawful actions and fire-able offenses by this employee while employed by The Giving Back Fund and that the complaints raised in the letter were baseless and without merit given documentation to the contrary.

Mr. Libit and Sportico did not include any of these details in the July 11, 2023 article.

50. Similarly, Mr. Libit and Sportico included only a limited, vague statement from Mr. Palakurthi regarding his faith in Mr. Pollick's leadership, rather than reporting on his extensive knowledge of GBF, the board, and Mr. Pollick based on his 26 years of involvement with the organization.

51. Upon information and belief, Defendants were concerned that their publications of and concerning GBF and Mr. Pollick were defamatory and sought the advice of counsel who advised to include in the articles that Plaintiffs (or someone on their behalf) had denied the false statements. If so, counsel's advice was incorrect as the fact that Defendants recognized the need to seek out counsel made clear that they knew or recklessly disregarded the truth and that they should not have published at all.

52. On February 8, 2024, Sportico and Mr. Libit published their third article, again written by Mr. Libit, falsely headlined "**Super Bowl Fundraiser BGBG Tries Luck in Vegas After Arizona 'Disaster'**" on its website, www.sportico.com/leagues/football/2024/giving-back-fund-big-game-big-give-super-bowl-las-vegas-1234765670/.

53. Defendants knowingly and maliciously published this article one day before GBF's biggest event of the year, the 2024 BGBG event, which was to be hosted by comedian Kevin Hart. Leading up to the event, Mr. Libit reached out to Mr. Hart's representatives for comment. Upon information and belief, Defendants chose to release the article the day before the BGBG event despite the article having been completed and ready for publication well before the publication date.

54. Sportico and Mr. Libit made additional false statements regarding GBF and Mr. Pollick in their February 2024 article and reported on the false statements of others without properly assessing the truth of the statements.

55. Those false statements in the third article include but are not limited to the following:

a. Defendants falsely reported "[t]hat the party has been able to survive for so long, former employees observed, owes in large part to the transient nature of the Super Bowl, offering Pollick a chance to start from scratch each year in a different city while the prior event's bridges smoldered behind him." This statement is false and omits material information, as Defendants knew. The BGBG events have been overwhelmingly positive and GBF has repeatedly worked with certain partners, celebrity hosts, and homeowners for multiple BGBG events.

b. Defendants falsely reported that "[f]ollowing the 2017 BGBG held in Houston, participants received tax deduction letters stating the event was 'able to raise more than $1 million for eight worthwhile charities.' On the Giving Back Fund's tax return that year, the fundraiser was shown to have grossed $1.36 million in revenue, while costing $1.11 million in directly related expenses. Making up that latter figure were rent and facility costs of $192,322; food and beverage costs of $194,208; $85,171 for entertainment; and $637,296 in 'other direct expenses.'" These statements were false, as Defendants knew. They did not reflect true numbers for the BGBG event and reflect categories of expenses that are not related to the BGBG event. For example, the use of the home where the event was held was donated and there was no rental cost at all. Further, donations to charities are typically part of the expenses of the event. These statements gave an extremely distorted impression to the reader, which is journalistically unfair.

c. Defendants reported the 2023 BGBG event planner's false statement that she had threatened to take legal action for nonpayment of a $22,500 fee. This report was false, as Defendants knew or should have known. There was no fee due and the event planner had in fact been overpaid. Defendants failed to properly validate this statement. In fact, GBF advised Defendants that she was paid more than she was owed prior to publication of the article. Defendants chose not to include GBF's position in its article.

d. Defendants falsely reported that "[u]nbeknownst to the public, however, is how many of these parties have left a trail of controversy." This statement was false, as Defendants knew, and wrongly implied that Defendants have information that a large number of the BGBG parties have been embroiled in controversy. This is not accurate, and indeed, GBF's events have been overwhelmingly positive and successful. In just its second year, 2010, BGBG was named the Number One Event at the Super Bowl by ESPN The Magazine. Indeed, GBF's event consistently has been hailed by hundreds of media outlets as the best at the Super Bowl, year in and year out.

e. Defendants falsely reported that "[t]his pattern of turmoil is attested to by hundreds of pages of documents and dozens of people who spoke to Sportico for this story, most on the condition that they not be identified, for fear of retribution." This statement is

false, as Defendants knew. Mr. Pollick has never taken "retribution" against any employee at any time, has not threatened to do so, and has not been reported as doing so.

f. Defendants falsely reported that "[t]he year before, the party in conjunction with the LA Super Bowl took place in the Metaverse—with some fairly adverse results . . . [.]" This statement was false, as Defendants knew. The event had been hosted by Rob Lowe, was the first Super Bowl event ever held in the Metaverse, and went very well. As one example only, Meta had donated to GBF its substantial work on the virtual stadium worth more than $2 Million and after the event donated the entire virtual stadium to GBF.

g. Defendants falsely reported that "[a]ll of a sudden, Pollick was presented with dueling objectives: the unassuming work running a fiscal sponsor for nonprofit clients, and the more glamorous job of rubbing elbows with A-listers on Super Bowl weekend. In time, according to a number of those who worked for Pollick, the latter came to outstrip the former." This statement is false, as Defendants knew. Mr. Pollick's focus is and has always been on the running of GBF and its philanthropy. The BGBG events attended by celebrities raised money not only for their own charities but also for GBF to allow it to pay salaries to its employees and to fund GBF's Fund for the Advancement of Philanthropy. This fund has allowed GBF to support worthy start-up nonprofits with limited funds and important missions that otherwise would not be able to get off the ground.

h. Defendants falsely reported, to support its claim that GBF was spending beyond its means, "[a]ccording to a copy of Wahlberg's hosting agreement *Sportico* obtained, GBF agreed to provide a private jet—specifically, an Embraer Legacy 600 aircraft—to shuttle the actor and up to a dozen guests from New Orleans to Los Angeles, to Phoenix, and then back to New Orleans." This statement falsely implied that GBF paid for the private jet, which was not true, as Defendants knew. The private jet was donated for the event and GBF has never paid for a private jet for any celebrity.

i. Defendants falsely reported that "[w]hile GBF has followed through on some of its celebrity appearance commitments for last year—Connie Watt, the mother of J.J. Watt, confirmed that their organization received its $100,000 remittance—representatives of Ray Lewis and Patrick Willis say they have not received their shares. And the Giving Back Fund's board now suggests it is not inclined to make good on those." This statement was false, as Defendants knew. These individuals were not paid because GBF never agreed to pay them and, like other celebrities, they donated their time to the event.

56. All of the above statements are false and defamatory. Defendants published all of the above false statements with actual malice, a knowing or reckless disregard of the truth, and/or negligently.

57. Again, prior to publishing the third article, Mr. Libit and Sportico had emailed Mr. Pollick and GBF to request information regarding topics addressed in the article. Mr. Pollick and GBF responded fully to those questions.

58. Nonetheless, as set forth above, Mr. Libit and Sportico disregarded the information that Mr. Pollick and GBF provided in their article in order to publish its false statements. As several examples only:

a. Mr. Libit wrote to Mr. Pollick:

> I've reviewed communications between GBF and Felisa Israel, documenting the strife between the parties following last year's BGBG. Some communications show you blaming Felisa for the way the event turned out and having a "distorted sense of reality." Did you resolve the matter with Felisa? And is GBF still the fiscal sponsor for Felisa's foundation?

Mr. Pollick responded:

> We no longer are her fiscal sponsor. She was given special discounts on her fees the entire time she was a client, and she left owing money. Many tasks that were her company's responsibility were left unfinished at the conclusion of the event by her and her team. Among many other issues, GBF auction items were not returned.

Mr. Libit and Sportico did not include this response in the third article, instead only reporting on Ms. Israel's claims.

b. Mr. Libit wrote to Mr. Pollick:

> Tax documents and interviews with sources appear to contradict the notion that the 2023 BGBG was the first to lose money. Sources told me that previous BGBG's barely broke even or lost money. GBF's tax filings from some years indicate the same. How would you respond to the claim that BGBG has a history of falling short of its financial targets?

Mr. Pollick responded:

> This is incorrect. We have never lost money and our tax filings do not indicate that. All fundraising totals and expenses are usually rolled up into one number and in a case where BGBG expenses are broken out, which would be rare, it includes the charitable donations as expenses but they are donations to others as well as reimbursing GBF as a charity also for its underwriting of the event.

In the article, although Mr. Libit and Sportico repeatedly reported that GBF's BGBG event had lost money and was a "drain[]" on its resources, it purportedly provided GBF's position with a single cursory sentence: "The Giving Back Fund insists this is not the case."

c. Mr. Libit wrote to Mr. Pollick:

> How long do you plan to continue in your role as GBF executive director? Have you and the board had any discussions about a leadership succession plan?

Mr. Pollick responded to Mr. Libit:

> Mr. Pollick serves GBF at the pleasure of the Board.

Mr. Libit and Sportico did not report on the GBF Board's oversite of Mr. Pollick's position. Instead, throughout its article, Mr. Libit and Sportico repeatedly, falsely reported that Mr. Pollick was using his position to benefit himself, and not in a manner that would ever have been condoned by the board that has gladly retained Mr. Pollick as CEO for decades. Far from benefiting himself, Mr. Pollick worked without taking any salary for the first two years that he led GBF. GBF's board passed a resolution to accrue those two years of salary at a modest interest rate and pay it when GBF had the funds available. By the time the funds were available, the amount had compounded to $541,640. Rather than take the accrued salary that was rightfully his, Mr. Pollick chose to donate all of the money back to GBF. For the first 20 years of his employment, Pollick did not request or accept a raise or even a Cost-of-Living Adjustment in salary.

59. In pursuit of their preconceived and sensationalistic agenda, Defendants carefully tailored their information gathering to rely only upon biased individuals, and specifically biased individuals who had been terminated for cause whom Defendants knew would have grievances they were likely to express in exchange for anonymity, and willfully failed to review public and other information available to them that would have disproven the information they relied upon. In short, Defendants deliberately decided to portray GBF as a failing entity and Mr. Pollick as a bad actor.

60. Defendants' numerous defamatory statements reached people across the country, and beyond, including in Massachusetts, via Defendants' self-described "robust" network, and

resulted in harm to both GBF and Mr. Pollick's reputations in Massachusetts and across the country.

**Sportico's and Mr. Libit's Interference with GBF's and Mr. Pollick's Business**

61. As alleged above, Defendants intentionally released their February 8, 2024 article one day before GBF's 2024 BGBG, which was to be hosted by the internationally known comedian Kevin Hart. Mr. Libit reached out to Mr. Hart's representative for comment prior to publishing the article. Mr. Libit knew at the time that he contacted Mr. Hart's representative that Mr. Hart was scheduled to host the BGBG.

62. Mr. Libit advised Mr. Hart's representative that he was about to publish a negative article about GBF, Mr. Pollick, and the BGBG. Upon information and belief, Mr. Libit advised Mr. Hart's representative of numerous falsities of and concerning GBF and Mr. Pollick in order to convey the false message that BGBG was a financial disaster and worse.

63. As a result of Mr. Libit's false statements to Mr. Hart's representative, Mr. Hart drastically reduced his role and profile at the event. Mr. Hart instructed GBF that (1) GBF could not use his name or likeness in promoting the 2024 BGBG event; (2) GBF could not inform anyone that Mr. Hart would be hosting the event; and (3) GBF could not put GBF signage at the event—which was GBF's own event.

64. As a result of Mr. Hart's limitations, GBF was unable to properly promote the BGBG event. Because of Mr. Libit's interference, revenue from the event was substantially decreased, by more than $2 million.

65. Mr. Libit's interference destroyed the prior advantageous relationship between GBF and Mr. Hart.

## V. COUNTS

### COUNT I - DEFAMATION

**The Giving Back Fund, Inc. and Marc Pollick v. Defendants**

66. Plaintiffs repeat and reallege here all of the allegations set forth above.

67. Sportico and Mr. Libit published their false and defamatory statements of and concerning Plaintiffs with actual malice—a knowing or reckless disregard of the truth. Plaintiffs are not public figures nor are they limited purpose public figures such that they need only prove Defendants' negligent publication.

68. Sportico and Mr. Libit's defamatory statements of and concerning Plaintiffs were defamatory per se.

69. Sportico and Mr. Libit's defamatory statements damaged GBF and Mr. Pollick for which Sportico and Mr. Libit are liable.

### COUNT II – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

**The Giving Back Fund, Inc. v. Defendants**

70. Plaintiffs repeat and reallege here all of the allegations set forth above.

71. GBF had a business relationship with Mr. Hart.

72. Mr. Libit was aware of GBF's business relationship with Mr. Hart.

73. Mr. Libit intentionally contacted Mr. Hart on behalf of Sportico in order to publish false and defamatory statements regarding GBF and Mr. Pollick to him in order to cause damages to GBF and to further Defendants' false story. Mr. Libit acted intentionally with the improper motive of undermining GBF's relationship with Mr. Hart and to harm GBF.

74. As a result of Mr. Libit's interference, Mr. Hart significantly curtailed his involvement with GBF.

75. GBF suffered harm as a result of Mr. Libit's interference with GBF's business agreement with Mr. Hart including lost business and lost income.

**COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Marc Pollick v. Defendants**

76. Plaintiffs repeat and reallege here all of the allegations set forth above.

77. Defendants knew and intended that their publication of false statements concerning Mr. Pollick and the GBF would cause Mr. Pollick emotional distress.

78. Defendants' conduct as set forth above was extreme and outrageous and beyond the bounds of common decency.

79. Mr. Pollick suffered severe emotional distress as a result of Defendants' conduct.

80. Mr. Pollick's severe emotional distress, caused by Defendants' intentional, malicious conduct, was of such a nature that no reasonable person could be expected to endure it.

81. Defendants' actions resulted in damages to Mr. Pollick, including ongoing severe emotional distress and monetary losses.

**COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**Marc Pollick v. Defendants**

82. Mr. Pollick repeats the allegations set forth above as if fully contained herein.

83. Defendants took actions that they knew or should have known would cause Mr. Pollick emotional distress.

84. Mr. Pollick suffered severe emotional distress as a result of Defendants' negligent conduct, including without limitation causing him nausea, loss of appetite, sleeplessness, and anxiety.

85. A reasonable person would have suffered emotional distress as a result of Defendants' actions.

86. Defendants' actions resulted in damages to Mr. Pollick, including ongoing severe emotional distress and monetary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs The Giving Back Fund, Inc. and Marc Pollick respectfully request that this Court:

i. enter judgment in favor of Plaintiffs and award Plaintiffs damages on the counts set forth above;

ii. order injunctive relief requiring Defendants to immediately remove the articles referenced in Paragraphs 25, 43, and 52 from the Sportico website and any other medium in which they published or referenced the articles and preventing Defendants from disseminating the articles further;

iii. award The Giving Back Fund, Inc. and Marc Pollick their attorneys' fees and costs; and

iv. grant such other and further relief as the Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

THE GIVING BACK FUND AND MARC POLLICK,

By their attorneys,

*/s/ Howard M. Cooper*

Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Maria T. Davis (BBO # 675447)
mdavis@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

I HEREBY ATTEST AND CERTIFY ON July 27, 2026, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

Dated: July 2, 2026

## CERTIFICATE OF SERVICE

I, Howard M. Cooper, hereby certify that on this 2nd day of July 2026, I caused a true and accurate copy of the foregoing document to be served on counsel of record for all parties via email.

Jeffrey J. Pyle, Esq.
Prince Lobel Tye LLP
One International Place, Suite 3700
Boston, MA 02110
jpyle@princelobel.com

*/s/ Howard M. Cooper*
Howard M. Cooper

# Exhibit A

Date Filed 7/2/2026 5:14 PM
Superior Court - Suffolk
Docket Number 2684CV01663

I am a reporter for Sportico, the sports business publication, working on a story about the Giving Back Fund. I've heard from sources about a lot of turmoil and issues within the organization. Hoping to confirm/ learn some things from you. Happy to grant you anonymity, as I have with other sources. Please message or call me at your earliest convenience.

Thank you,

Daniel Libit
Sportico
[redacted]

# Exhibit B

[redacted]

May 27, 2026

To: Scott Soshnick
Editor, Sportico
ssoshnick@sportico.com

Daniel Libit
Reporter, Sportico
dlibit@sportico.com

Dear Mr. Soshnick and Mr. Libit:

My name is [redacted]. It has come to my attention that you published in Sportico a letter I wrote to my then-employer, The Giving Back Fund, Inc., regarding that company and its CEO, Marc Pollick. I also understand that in your articles you quoted my letter and made repeated references to it.

Please be advised that I did not give Sportico or Mr. Libit permission to use my letter, or to publish my letter, or to quote or reference my letter in the articles. I still do not give any such permissions to Sportico or Mr. Libit. Further, I did not send my letter to Sportico, nor did I give anyone permission to send my letter to Sportico. That letter was intended to be confidential to the addressees. In fact, in the course of writing these articles Mr. Libit reached out to me and I specifically informed him that I declined to be involved in any way.

Further, please be advised that there were certain allegations in my letter which were incorrect, exaggerated and/or for which I did not have facts to base them. I regret writing that letter in that form because of this. If I could turn back the clock, I would not have submitted that letter in that form.

I cannot turn back the clock, of course, but to fix any problems I may have inadvertently caused I wish for Sportico to promptly remove my letter from its website and from its articles, to remove any quotations Sportico may have used from my letter, and to remove any references to my letter from the Sportico website and its articles. I reserve all rights, but at a minimum please abide by my request herein.

Thank you.

Sincerely,

[redacted]

6

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPT.
OF THE TRIAL COURT
No. 2684CV01663 B

(US DIST.# 26-CV-13325)

THE GIVING BACK FUND, INC. and MARC POLLICK,

Plaintiffs,

v.

SPORTICO MEDIA, LLC and DANIEL LIBIT,

Defendants.

**NOTICE OF FILING OF NOTICE OF REMOVAL**

TO: Clerk of Court
Superior Court
Suffolk County, Massachusetts

Please take notice that on this 21st day of July, 2026, defendants Sportico Media, LLC and Daniel Libit filed a Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, removing this action from the Superior Court of Suffolk County, Massachusetts to the United States District Court for the District of Massachusetts.

A copy of the Notice of Removal is attached hereto as Exhibit A.

Respectfully submitted,

SPORTICO MEDIA, LLC and
DANIEL LIBIT,

By their attorney,

*/s/ Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO # 647438)
jpyle@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
T: 617-456-8000
F: 617-456-8100

I HEREBY ATTEST AND CERTIFY ON July 27, 2026, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ________
Assistant Clerk

Dated: July 21, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2026, I served the foregoing by U.S. Mail and electronic mail on the below-listed counsel:

Howard M. Cooper, Esq.
Maria T. Davis, Esq.
TODD & WELD
One Federal Street, 27th Floor
Boston, MA 02110
hcooper@toddweld.com
mdavis@toddweld.com

*/s/ Jeffrey J. Pyle*
Jeffrey J. Pyle



#6332985v1

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE GIVING BACK FUND, INC. and MARC POLLICK,<br><br>Plaintiffs, | ) | |
| v. | ) | C.A. No. ____________ |
| SPORTICO MEDIA, LLC and DANIEL LIBIT,<br><br>Defendants. | ) | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendants Sportico Media, LLC and Daniel Libit ("Defendants") file this Notice of Removal and hereby remove this action from the Superior Court of the Commonwealth of Massachusetts, Suffolk County (the "Superior Court"), to the United States District Court for the District of Massachusetts. A Civil Action Cover Sheet is attached hereto as **Exhibit 1**, and a Category Form is attached hereto as **Exhibit 2**. In support of removal, Defendants respectfully state the following:

1. On or about June 4, 2026, plaintiffs The Giving Back Fund, Inc. and Marc Pollick filed a civil action in the Suffolk Superior Court entitled *The Giving Back Fund, Inc. et al. v. Sportico Media, LLC et al.*, 2684CV01663 (the "Action"). On June 22, 2026, Defendants accepted service of the summons and complaint in the action and received a copy of the same. (**Exhibit 3**).

2. This Notice of Removal is timely because it is being filed within 30 days of Defendants' receipt of the initial pleading setting forth the claim for relief upon which the Action is based, as required by 28 U.S.C. § 1446(b)(1) (Exhibit 3).

3. Pursuant to 28 U.S.C. § 1332(a)(1), federal district courts "shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between . . . citizens of different states." As shown below, the requirements of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) are satisfied here.

4. Plaintiff The Giving Back Fund, Inc. is a Massachusetts corporation. (**Exhibit 4**, Complaint, ¶ 2). Plaintiff Marc Pollick is an individual who, on information and belief, resides in Florida. Defendant Sportico Media, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California. (*Id.*, ¶ 4). Daniel Libit is an individual who resides in Chicago, Illinois. (*Id.*, ¶ 5).

5. Plaintiffs demand more than $75,000 in damages as required by 28 U.S.C. § 1332(a). (**Exhibit 5**, Superior Court Civil Action Cover Sheet, (asserting damages of "$1,000,000.00+").

6. Accordingly, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

7. Since the service of the summons and complaint on June 22, 2026, the Plaintiffs have filed an Amended Complaint. (**Exhibit 6**).

8. No previous application has been made for the relief requested herein.

9. Removal to this Court is proper because it is "the district and division embracing the place where [the Action] is pending." 28 U.S.C. § 1441(a). The Suffolk Superior Court is

within the United States District Court for the District of Massachusetts, Eastern Division. *See* 28 U.S.C. § 101; Local Rule 40.1(c).

WHEREFORE, Defendants Sportico Media, LLC and Daniel Libit remove this action from the Superior Court to this Court pursuant to 28 U.S.C. § 1441.

Respectfully submitted,

SPORTICO MEDIA, LLC and
DANIEL LIBIT,

By their attorney,

*/s/ Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO # 647438)
jpyle@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
T: 617-456-8000
F: 617-456-8100

Dated: July 21, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2026, I served the foregoing by U.S. Mail and electronic mail on the below-listed counsel:

Howard M. Cooper, Esq.
Maria T. Davis, Esq.
TODD & WELD
One Federal Street, 27th Floor
Boston, MA 02110
hcooper@toddweld.com
mdavis@toddweld.com

*/s/ Jeffrey J. Pyle*
Jeffrey J. Pyle

# EXHIBIT 1

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

THE GIVING BACK FUND, INC. and MARC POLLICK

(b) County of Residence of First Listed Plaintiff: Suffolk County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Howard Cooper, BBO 543842; Maria Davis, BBO 675447;
Todd & Weld, One Federal St, 27 Fl., Boston, MA 02110
(617-720-2626)

## DEFENDANTS

SPORTICO MEDIA, LLC and DANIEL LIBIT

County of Residence of First Listed Defendant: Los Angeles, California
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Jeffrey Pyle, BBO 647438
Prince, Lobel Tye LLP, 1 International Pl., Suite 3700
Boston, MA 02110 (617-456-8143)

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [X] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [X] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
28 U.S.C. §§ 1332, 1441, and 1446

Brief description of cause:
Defamation action.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____ DOCKET NUMBER ____

DATE: July 21, 2026

SIGNATURE OF ATTORNEY OF RECORD: /s/ Jeffrey J. Pyle

**FOR OFFICE USE ONLY**

RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) The Giving Back Fund, Inc. et al. v. Sportico Media, LLC, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

☑ III. 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐ NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES ☐ NO ☑

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐ NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐ NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☑ NO ☐

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☑ Central Division ☐ Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐ Central Division ☐ Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐ NO ☑

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Jeffrey J. Pyle

ADDRESS Prince Lobel Tye LLP, 1 International Place, Suite 3700, Boston, MA 02110

TELEPHONE NO. 617-456-8143

(CategoryForm11-2020.wpd )

# EXHIBIT 3

4

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPT.
OF THE TRIAL COURT
No. 2684CV01663

THE GIVING BACK FUND, INC. and MARC POLLICK,

Plaintiffs,

v.

SPORTICO MEDIA, LLC and DANIEL LIBIT,

Defendants.

**ACKNOWLEDGEMENT AND WAIVER OF SERVICE OF SUMMONS AND COMPLAINT IN ACCORDANCE WITH MASS. R. CIV. P. 4**

As counsel for defendants, Sportico Media, LLC and Daniel Libit, I agree to waive service of process and accept electronic copies of the Summons and Complaint on behalf of the defendants in this action. Further, I acknowledge that I received electronic copies of the Summons, Civil Action Cover Sheet, Complaint and Jury Demand and Civil Tracking Order on the defendants' behalf on June 22, 2026. Defendants waive any defense of insufficiency of process or insufficiency of service of process, and reserve all other defenses.

/s/ *Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO #647438)
Prince Lobel Tye LLP
One International Place, Suite 3700
Boston, MA 02110
(617) 456-8000
jpyle@princelobel.com

Dated: June 23, 2026

## CERTIFICATE OF SERVICE

I, Howard M. Cooper, hereby certify that a true copy of the foregoing document was served upon counsel of record via electronic mail on July 1, 2026.

Jeffrey J. Pyle, Esq.
Prince Lobel Tye LLP
One International Place, Suite 3700
Boston, MA 02110
jpyle@princelobel.com

*/s/ Howard M. Cooper*
Howard M. Cooper

| Summons | CIVIL DOCKET NO. 2684CV01663 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: The Giving Back Fund, Inc. et al Plaintiff(s) vs. Sportico Media, LLC et al Defendant(s) | | John E. Powers III Clerk of Courts Suffolk County<br>COURT NAME & ADDRESS: Suffolk Superior Civil Court Three Pemberton Square Boston, MA. 02108 |

THIS SUMMONS IS DIRECTED TO Sportico Media, LLC (Defendant's name)

You are being sued. The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Suffolk Superior Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. If you need more time to respond, you may request an extension of time in writing from the Court.

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court and mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your signed original response with the Clerk's Office for Civil Business, Suffolk Superior Court Three Pemberton Square Boston, MA 02108 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, AND

b) Delivering or mailing a copy of your response to the Plaintiff's attorney/Plaintiff at the following address: Todd & Weld LLP, Attn: Howard Cooper, One Federal Street, Boston, MA 02110

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must specifically request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Rule 12 of the Massachusetts Rules of Civil Procedure. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Michael D. Ricciuti, Chief Justice on June 15, 2026. (Seal)

Clerk [signature]

Note: The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

**PROOF OF SERVICE OF PROCESS**

I hereby certify that on ______________, I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

______________________________________________

______________________________________________

______________________________________________

Dated: ______________ Signature: ______________________

**N.B. TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

| Summons | CIVIL DOCKET NO. 2684CV01663 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>The Giving Back Fund, Inc. et al<br>Plaintiff(s)<br>vs.<br>Sportico Media, LLC et al<br>Defendant(s) | | John E. Powers III, Clerk of Courts<br>Suffolk County<br>COURT NAME & ADDRESS:<br>Suffolk Superior Civil Court<br>Three Pemberton Square<br>Boston, MA. 02108 |

THIS SUMMONS IS DIRECTED TO Daniel Libit (Defendant's name)

You are being sued. The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Suffolk Superior Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. If you need more time to respond, you may request an extension of time in writing from the Court.

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court and mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your signed original response with the Clerk's Office for Civil Business, Suffolk Superior Court Three Pemberton Square Boston, MA 02108 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, AND

b) Delivering or mailing a copy of your response to the Plaintiff's attorney/Plaintiff at the following address: Todd & Weld LLP, Attn: Howard Cooper, One Federal Street, Boston, MA 02110

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must specifically request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Rule 12 of the Massachusetts Rules of Civil Procedure. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Michael D. Ricciuti, Chief Justice on June 15, 20 26. (Seal)

Clerk [signature]

Note: The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

**PROOF OF SERVICE OF PROCESS**

I hereby certify that on ____________, I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

______________________________________________

______________________________________________

______________________________________________

Dated: ____________ Signature: ____________________

N.B. TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date:

# EXHIBIT 4

1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT DEPT. OF THE TRIAL COURT

THE GIVING BACK FUND, INC. and MARC POLLICK

Plaintiffs,

v.

SPORTICO MEDIA, LLC and DANIEL LIBIT

Defendants.

CIVIL ACTION NO.
kg

**COMPLAINT AND JURY DEMAND**

**i. Introduction**

1. Plaintiffs, The Giving Back Fund, Inc. ("GBF") and its leader Marc Pollick ("Mr. Pollick") (together "Plaintiffs"), bring this action for, *inter alia,* defamation and tortious interference with advantageous business relations against Defendants, Sportico Media, LLC ("Sportico") and Daniel Libit ("Mr. Libit") (together "Defendants"). Plaintiffs seek to recover damages necessary to make them whole for the substantial harm Defendants caused them as a result of Defendants' publication in bad faith, negligently and/or with a knowing or reckless disregard of the truth, numerous false and defamatory lies concerning Plaintiffs. GBF is a non-profit, charitable organization which has been led by Mr. Pollick for many years. Until Defendants undertook their unlawful defamation campaign, both GBF and Mr. Pollick had long enjoyed hard-earned and well-deserved stellar reputations. Defendants' lies, including their lies about Plaintiffs' important charitable endeavors, unlawfully and substantially damaged

Plaintiffs' reputations and caused other injuries. Defendants are liable for damages for their wrongdoing and the harm they caused.

### ii. Parties

2. Plaintiff GBF is a Massachusetts nonprofit corporation with a principal place of business located at 500 Commercial Street in Boston, Suffolk County, Massachusetts. As a Massachusetts based non-profit, GBF is subject to oversight within the Commonwealth.

3. Plaintiff Mr. Pollick is an individual and the founder and President of GBF.

4. Defendant Sportico is a Delaware corporation with a principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, California 90064. At all times relevant hereto, including during much of its unlawful defamation campaign, Sportico was registered to do business in the Commonwealth.

5. Defendant Mr. Libit is an individual who upon information and belief resides in Chicago, Illinois. Mr. Libit regularly publishes pieces he authors into the Commonwealth including the defamatory publications at issue here.

### iii. Jurisdiction and Venue

6. The exercise of personal jurisdiction over Sportico and Mr. Libit is lawful and proper where Defendants published their false and defamatory statements attacking Plaintiffs on the Sportico digital platform by which Defendants intended to and did in fact reach audiences in Massachusetts. Defendants knowingly published into Massachusetts and were fully aware that their false and defamatory statements would cause injury to Plaintiffs here.

7. Venue is lawful and proper in Suffolk County because Defendants' false and defamatory statements caused injury to Plaintiffs here.

### iv. Facts

### About The Giving Back Fund and Mr. Pollick

8. Mr. Pollick founded GBF in 1997 with the goal of helping professional athletes, celebrities, high-net-worth individuals, corporations, and others establish and maintain charitable foundations.

9. GBF is a non-profit organization that provides philanthropic consulting, management and administrative services to donors. Among other things, GBF strives to and succeeds in helping its donors make the greatest charitable impact possible.

10. GBF's commitment to its mission and to its donors has been a success. Over nearly three decades, GBF has launched more than 1,000 foundations. It has facilitated more than one billion dollars in donations and grants to thousands of causes across the world.

11. GBF has supported causes including, without limitation, researching cures for numerous diseases, treatment of mental health disorders, earthquake relief, education for women and girls in Africa, scholarships, fighting discrimination, and hundreds of other important causes.

12. GBF has had the opportunity to work with funds established by individuals including Yao Ming, Doug Flutie, Jim Brown, Pelé, Steve Gleason, Jalen Rose, and Cara Delevingne, among other well-known individuals.

13. GBF continues to work tirelessly to expand the number of people and the amount of resources dedicated to charitable giving.

14. One of the ways in which GBF works to carry out its mission is by hosting events to raise funds for charities. GBF's signature event, held every year between 2009 and 2024 (other than when affected by Covid), has been the "Big Game Big Give" ("BGBG") event held during the week of the Super Bowl.

15. The BGBG is hosted by celebrities who volunteer their participation in exchange for a contribution to the celebrity host's chosen charity. The event has raised over $11 million dollars and benefited numerous charities around the country. Celebrities including, without limitation, Michael Bay, Jamie Foxx, Mark Wahlberg, Joe Montana, Rob Lowe, Jay Leno, Alec Baldwin, Hilary Swank, David Schwimmer, Michael Phelps and The Black Eyed Peas have hosted the event in the past. Sponsors of the BGBG have included J.P. Morgan, Goldman Sachs, AOL, Aston Martin, BMW, Lamborghini, USA Today, and Forbes, among other well-known companies.

16. GBF produces its BGBG event (and others) on a relatively modest budget and relies on the significant donations of others to put on the event. GBF's BGBG event consistently has been viewed as a spectacular success and is repeatedly attended by many of the same guests, donors, and participants. Michael Bay has hosted it without charge four times, as has Academy Award Winner Jamie Foxx.

**About Sportico**

17. Penske Media Corporation launched Sportico in 2020. Sportico styles itself as a media news platform and professes on its website to be "the premier destination for professionals and informed readers seeking authoritative news and analysis on the $500 billion global sports industry." Sportico further touts itself as providing news and analysis "covering every facet of the business of sports" through its "robust digital platform, newsletters, and live events." In fact, Sportico is a sensationalistic outlet willing to knowingly publish falsehoods as alleged herein.

**Sportico and Mr. Libit's Defamation of GBF and Mr. Pollick**

18. In or about 2023, Sportico and Mr. Libit conceived of and began a months long defamation campaign targeted at GBF and its founder, Mr. Pollick.

19. Sportico and Mr. Libit published numerous damaging false and defamatory statements of alleged fact regarding both GBF and Mr. Pollick, some of which were knowingly and recklessly fabricated or which were published negligently. Worse, Sportico and Mr. Libit continued to publish in blatant disregard of the actual facts after the actual facts were provided to them.

20. Upon information and belief, the source for Defendants' information was a known and obviously disgruntled former professional whom GBF had terminated its relationship with, whose bias was clear from publicly available sources including a lawsuit, and who had threatened GBF and Mr. Pollick in writing for having terminated him.

21. Some of the specific false and misleading allegations in Defendants' three (3) articles are set forth below, without limitation.

22. As is well known, GBF is an extremely well-run and effective charity. Over the past 29 years, under Mr. Pollick's leadership, GBF has created more than 1,000 foundations all over the world and has facilitated the distribution of more than *one billion dollars* to people in desperate need. GBF's taxes are prepared annually by national CPA firms, and its financial reports have passed their audited inspections each year for its 29 years. *Not once*, until the appearance of Defendants' false and defamatory articles, has anybody accused Mr. Pollick of having been dishonest, or of having engaged in fraud, financial wrongdoing, employee harassment, or any other nefarious conduct whatsoever. To the contrary, all prior reporting on GBF and Mr. Pollick over the past three decades—including hundreds of magazine and newspaper articles— have lauded GBF's tireless work for charities and people in need.

23. On May 1, 2023, Sportico and Mr. Libit published its first article written by Mr. Libit. Defendants published this article under the false and defamatory headline "**Damar**

**Hamlin's Charity Sponsor, the Giving Back Fund, Embroiled in Strife.**" Defendants published their article on the Sportico website, www.sportico.com/business/sports/2023/damar-hamlin-charity-sponsor-giving-back-fund-1234721053/. The headline was false and defamatory and known by Defendants to be false and defamatory.

24. In their article, Mr. Libit and Sportico knowingly made numerous false statements regarding GBF and Mr. Pollick in order to falsely portray GBF as "an organization in strife and falling short of its sterling reputation[,]" with Mr. Pollick falsely portrayed as "the primary source of discontent." Defendants also reported false statements made almost exclusively anonymously by people who would not go on the record.

25. Defendants' knowingly false statements in the first article which are at issue here include but are not limited to the following:

a. Defendants falsely reported that GBF's "2021 tax return's statement of functional expenses contained numerous empty categories on line items such as legal, accounting and benefits paid to current top employees. These had previously been filled out in earlier returns. The organization reported spending about $3.4 million on "professional fees" in 2021, yet included no names in the section of the tax return for independent contractors earning at least $100,000." These statements were false, omit material information, and are misleading, as Defendants knew. GBF's tax returns have been prepared by reputable national firms and approved by its long-time certified public accountant, board, treasurer, and finance committee. GBF's tax returns have also passed 28 consecutive outside audits without ever receiving a management letter.

b. Defendants falsely reported that "[m]ultiple staffers and former clients say it has been a common occurrence for earmarked donations to be initially placed in the wrong accounts." This statement was false and misleading, as Defendants knew. While donations often arrive at GBF with no designation, GBF is scrupulous in reaching out to track down each donor to ensure that their donation, often made anonymously, is credited to the foundation for which it was intended.

c. Defendants falsely reported that "[w]hile touting itself as 'more than a fiscal sponsor,' former employees say GBF has long struggled to carry out the basic functions of a fiscal sponsor: depositing charitable contributions, keeping track of the money and providing solicitation notices to donors. Even the job of reconciling client accounts has proven to be an ever-elusive challenge. Of the 168 accounts that GBF had on its books last summer, only a third were considered 'in good standing,' internal

documents show." These statements were false and based on a misinterpretation of internal records that Defendants improperly sourced, as Defendants knew. GBF has been responsible for over 1,000 foundations, each of which required and received proper financial management.

d. Defendants falsely reported that "[m]any clients had to fight for a long time,' one former employee said. 'Most of them that I have seen ended up reaching some sort of compromise where they leave a lot of money at the Giving Back Fund.'" This statement was false, as Defendants knew. No client has ever had to fight for their money and no client has ever "left a lot of money" at GBF.

e. Defendants falsely reported that "[o]n the other end of the spectrum are clients like the Yao Ming Foundation, which multiple staffers say has effectively operated as a dormant GBF project for the last decade, while still shelling out some of the highest client fees. Yao's charity, launched in 2008 as a response to the deadly Sichuan earthquake, had been paying GBF $5,000 a month through mid-2021, when its fee was cut to $4,000 a month. (Messages left with Yao's agency, WME, did not receive a response.)." This statement was false and misleading, as Defendants knew. Mr. Ming's foundation is not dormant and receives significant donations every year and has made and received hundreds of thousands of dollars in grants.

f. Defendants falsely reported a "whistleblower's" statement that Mr. Pollick "had been barred from renting vehicles through Hertz because of a long-ago surcharge for damaging a rental vehicle that he wouldn't make good on." This statement was false as Defendants knew and were told in advance of publication. A Hertz representative collected the car from Mr. Pollick after a tire went flat and returned it to the wrong Hertz location. Hertz thought that it was Mr. Pollick who had returned the car to the wrong location and thus erroneously added a fee to his bill. The error was corrected and Mr. Pollick was not charged.

g. Defendants falsely reported the whistleblower's statement that in order to cancel airfare without a charge, Mr. Pollick would "sometimes l[ie] to say he had Covid" and that they were "not comfortable lying for him, so he would have me patch him in after waiting on hold. I booked and canceled the same pre-BGBG trip for him around 5 separate times." This statement was false, as Defendants knew. Mr. Pollick never lied to cancel or reschedule anything.

h. Defendants falsely reported that the whistleblower had reported "[e]mployees are scared of [Mr. Pollick's] retribution," and falsely reported that the same sentiment was "echoed by each of the two dozen former staffers who spoke to Sportico." This statement was false, as Defendants knew or should have known. Mr. Pollick has never taken "retribution" against any employee at any time, has not threatened to do so, has not been reported as doing so, and employees are not "scared" of him. This statement by Defendants is false.

i. Defendants falsely reported that GBF board member Joanne Pasternack quit the board and that her departure "closely followed those of two other directors, Danny Hughes

and Keeley Mooneyhan." These statements were false and misleading. Ms. Pasternack resigned only when faced with a Board Meeting specifically called to vote on whether to remove her from the board for cause, where all board members were expected to vote for her removal. At that time Ms. Pasternack had already been asked to step down twice and did not willingly "quit." Mr. Hughes left, after Ms. Pasternack, simply because his board term was over. Ms. Mooneyhan had left eight months before Ms. Pasternak because she had lost her job. Defendants' insinuation that there was a resignation of multiple board members *en masse* reflected a broader concern and was therefore false and misleading.

j. Defendants negligently and/or with actual malice reported that GBF's "[i]nternal documents also showed that in April 2020, GBF reimbursed NEXUS for a $41,800 payment it made to Spark Neuro, the company owned by the husband of NEXUS co-founder Rachel Gerrol, to rent office space in New York City. Former employees say they were troubled by what they perceived as a potential conflict of interest, but that it didn't matter." This statement was false, misleading, and omitted material information, as Defendants knew and were told in advance of publication. Ms. Gerrol's husband had given NEXUS office space at a substantial discount to save NEXUS, a charity, money. There was no potential conflict or any mismanagement of funds.

k. Defendants falsely reported that "Pollick's exhaustive list of personae non gratae includes some of his once-closest confidants." This statement was false, as Defendants knew. Mr. Pollick did not have an exhaustive list of personae non gratae including some of his once-closest confidants and the only example Defendants provided was a professional whom GBF sued and settled against based on his breach of duties to GBF.

l. Defendants falsely reported, after making a series of false and defamatory statements, "And yet, Pollick's public image has endured unscathed[,]" implying that there would be a reason for Mr. Pollick's reputation to have been harmed. This statement was false and misleading, as Defendants knew. As set forth above, Mr. Pollick has led GBF for 29 years, has created more than 1,000 foundations all over the world, and has facilitated the distribution of more than one billion dollars. He has never been accused of or found to have been dishonest, of having engaged in fraud, having engaged in employee harassment, or having conducted any other form of criminal wrongdoing.

m. Defendants falsely reported that "[i]n 2002, the Giving Back Fund made headlines when it filed a $15 million lawsuit against Britney Spears' former lawyer, Mark Steverson, following the pop star's decision to end her relationship with the GBF[,]" implying that GBF's lawsuit was motivated by Ms. Spears' decision to leave GBF. This statement was false, misleading, and omits material information, as Defendants knew. The lawsuit was based on the insistence of Mr. Steverson, who was a GBF board member, on using charitable funds for non-charitable purposes. GBF's board voted 14-0 to remove Mr. Stevenson as a board member and brought a publicly

accessible lawsuit against him for breach of fiduciary duty and breach of loyalty. The case was settled almost immediately in favor of GBF.

n. Defendants falsely reported that its source was a "whistleblower letter," implying that the individual writing the letter had acted at their own risk to call out wrongdoing by GBF. This statement was false, misleading, and omits material information. The employee Defendants dubbed a "whistleblower" was terminated after being found to have engaged in malfeasance through the investigation of an independent outside law firm. That investigation also showed that the allegations in the letter were false. The individual identified as the whistleblower refused to confirm that they had written the letter during the investigation and has since withdrawn the allegations in their letter.

o. Defendants falsely reported "[b]ut that is not the full story that emerges from interviews with dozens of sources—including clients, donors, contractors, board members and 24 former GBF employees—as well as a review of hundreds of pages of internal documents. Collectively, they portray an organization struggling to carry out basic oversight and accounting functions, and steeped in fear of its leader." This statement is false, misleading, and omits material information, as Defendants knew or should have known. Defendants implied they had significant sources that supported their false claim but only reported on limited sources whose narratives fit their story. Defendants omitted or did not seek information from numerous individuals from the 29-year-old GBF who would have truthfully and vigorously supported GBF and Mr. Pollick.

p. Defendants falsely reported a statement from Lisa Greer, who falsely reported that "at Pollick's solicitation, joined GBF's board as its president in 2021 before quitting three months later." Defendants also published the false statement from Ms. Greer "I encountered a great deal of resistance and great deal of anger with just trying to help the organization." These statements were false, misleading, and omitted material information, as Defendants knew or should have known. Ms. Greer was recruited as GBF's Chair, a role in which she served for only three months before she was asked to resign for improper conduct. Ms. Greer's opinion was not representative of GBF's other board members and employees, many of which were longstanding board members and employees.

q. Defendants falsely reported that a sign of strife was that GBF had a falling out with its longtime counsel, Andrew Morton. These statements were false and misleading, as Defendants knew. Attorney Morton was not a longtime counsel, was not on retainer with GBF, and was solely consulted from time to time on legal matters.

r. Defendants falsely reported that Attorney Morton "delivered a number of his athlete clients to the organization." This statement is false, as Defendants knew or should have known. Attorney Morton never delivered any client to GBF.

s. Defendants falsely reported "But GBF—having shuffled through several compliance companies over the last year—had been delinquent with its charity registrations in multiple states, according to multiple sources familiar with the situation." This

statement is false and misleading, as Defendants knew or should have known. GBF did not "shuffle" through several compliance companies, it sought a new company when its long term compliance company was no longer suitable and its first replacement was not a good fit for GBF. GBF retained its current firm which brought GBF compliant that same day.

t. Defendants falsely reported that "[e]arlier this year, Pollick settled a three-year-old lawsuit he filed against the Diplomat Beach Resort in Hollywood, Fla., which he originally sued for injuries and lost wages he claimed he suffered after colliding with a sliding glass door while staying at the hotel in 2019. At the time, Pollick was in Florida scouting a location for an upcoming Big Game Big Give party. Pollick, who receives an annual salary of around $250,000, eventually dropped his lost-wages claim, which could have required him to submit to discovery related to GBF's business." This statement is false and misleading, as Defendants knew, because it implied that Mr. Pollick dismissed his lost wages claim to avoid having to produce discovery related to GBF's business. There is no factual basis for this implication.

u. Defendants falsely reported that "Pollick's on-the-fly desire to sign up new clients led to a capricious fee structure, the former staffers say." This statement is false, as Defendants knew or should have known. Mr. Pollick did not and does not set client fees. Fees are set by the leadership team as a whole, through consensus.

26. On July 11, 2023, Sportico and Mr. Libit published their second article, also written by Mr. Libit, falsely headlined "**Giving Back Fund Investigates CEO, Fires Whistleblower**" on its website, www.sportico.com/business/sports/2023/giving-back-fund-investigation-ceo-whistleblower-1234730092/.

27. In the article, Mr. Libit and Sportico made numerous false statements regarding GBF and Mr. Pollick and reported on the false statements of others without properly validating the statements.

28. Defendants' false statements in the second article at issue here include but are not limited to the following:

a. Defendants' headline for the article was itself false and misleading. The title implies that GBF conducted its own investigation, which was ongoing, and fired an individual in retaliation for their proper reporting of misconduct. This statement was false and misleading, as Defendants knew. GBF hired Rubin & Rudman LLP, an independent and respected law firm, to investigate the administrative assistant's complaints regarding GBF and Mr. Pollick. The investigation was already complete when the

article was released and established that the neither GBF nor Mr. Pollick had committed any wrongdoing. Further, the employee was terminated for misconduct.

b. Defendants falsely reported that "[t]he employee who spoke up, however, was dismissed." This statement was false, misleading, omitted material information, as Defendants knew, and implied that the employee spoke up to raise legitimate concerns and was wrongly terminated. No employee "spoke up" of any material wrongdoing and no GBF employee was ever dismissed because they made a complaint. The employee was properly terminated for performance issues and misconduct. Here, the employee at issue was terminated because of the reasons stated above, not because of any protected activity.

c. Defendants falsely reported that "[w]hat emerged was a behind-the-scenes picture of an organization that, despite its four-star [Charity Navigator Rating], has long struggled to carry out some of the basic functions of a philanthropic fiscal sponsor, often promises more than it can deliver and is routinely impaired by the combative and wayward tendencies of its leader." These statements were false, as Defendants knew or should have known. As set forth above, GBF was and is a successful organization and owes much of its success to Mr. Pollick's dedication, leadership, and ability to work with clients, charities, and donors.

d. Defendants falsely reported that "[t]he upshot of the investigation appears to maintain the status quo, with Pollick having weathered it without so much as a slap on the wrist." These statements were false, misleading, show bias and malice, and omitted material information, as Defendants knew, and implied that Mr. Pollick deserved to be punished. The investigation resulted in no punishment for Mr. Pollick because Mr. Pollick was cleared of all wrongdoing by the investigation and there was no reason to punish him.

e. Defendants falsely reported that "Pollick remained, but within a year, most of those board members had quit, one of many exoduses of staff or directors at GBF." This statement was false, as Defendants knew, and wrongfully implied that individuals fled GBF because of GBF or Mr. Pollick's conduct. Over the years, GBF has had to ask certain members of the board to step down when their goals or motives did not align with GBF, but there has never been an exodus of staff or directors.

f. Defendants falsely reported that "[a] recent outside investigation into a whistleblower's complaints against the head of the Giving Back Fund, the fiscal sponsor for Damar Hamlin . . . and other pro athlete charities, resulted in no punishment for the executive." This statement was false, misleading, omitted material information, as Defendants knew, and implied that Mr. Pollick deserved to be punished. The investigation resulted in no punishment for Mr. Pollick because Mr. Pollick was cleared of all wrongdoing by the investigation and there was no reason to punish him. Defendants, who repeatedly referenced the investigation in the article, were aware that the investigation had concluded and that Mr. Pollick had been cleared of any and all wrongdoing.

g. Defendants falsely reported that "[i]n her resignation, she had recommended that GBF's board do a 12-point, top-down review of the organization, from its finances to various critical postings that had been made over the years on employment websites like Glassdoor and Indeed." This statement was false and misleading, as Defendants knew, because it wrongly implied that Ms. Pasternack made the decision to resign on her own. As set forth above, Ms. Pasternack resigned only when faced with a board meeting specifically called to vote on whether or not to remove her from the board for cause, where all board members were expected to vote for her removal. At that time Ms. Pasternack had already been asked to step down twice.

29. On February 8, 2024, Sportico and Mr. Libit published their third article, again written by Mr. Libit, falsely headlined "**Super Bowl Fundraiser BGBG Tries Luck in Vegas After Arizona 'Disaster'**" on its website, www.sportico.com/leagues/football/2024/giving-back-fund-big-game-big-give-super-bowl-las-vegas-1234765670/.

30. Defendants knowingly and maliciously released this article one day before GBF's biggest event of the year, the 2024 BGBG event, which was to be hosted by comedian Kevin Hart. Leading up to the event, Mr. Libit reached out to Mr. Hart's representatives for comment. Upon information and belief, Defendants chose to release the article the day before the BGBG event despite the article having been completed and ready for publication well before the publication date.

31. Sportico and Mr. Libit made additional false statements regarding GBF and Mr. Pollick in their February 2024 article and reported on the false statements of others without properly assessing the truth of the statements.

32. Those false statements in the third article include but are not limited to the following:

a. Defendants falsely reported "[t]hat the party has been able to survive for so long, former employees observed, owes in large part to the transient nature of the Super Bowl, offering Pollick a chance to start from scratch each year in a different city while the prior event's bridges smoldered behind him." This statement is false and omits material information, as Defendants knew. The BGBG events have been overwhelmingly positive and GBF has repeatedly worked with certain partners, celebrity hosts, and homeowners for multiple BGBG events.

b. Defendants falsely reported that "[f]ollowing the 2017 BGBG held in Houston, participants received tax deduction letters stating the event was 'able to raise more than $1 million for eight worthwhile charities.' On the Giving Back Fund's tax return that year, the fundraiser was shown to have grossed $1.36 million in revenue, while costing $1.11 million in directly related expenses. Making up that latter figure were rent and facility costs of $192,322; food and beverage costs of $194,208; $85,171 for entertainment; and $637,296 in 'other direct expenses.'" These statements were false, as Defendants knew. They did not reflect true numbers for the BGBG event and reflect categories of expenses that are not related to the BGBG event. For example, the use of the home where the event was held was donated and there was no rental cost at all. Further, donations to charities are typically part of the expenses of the event. These statements gave an extremely distorted impression to the reader, which is journalistically unfair.

c. Defendants reported the 2023 BGBG event planner's false statement that she had threatened to take legal action for nonpayment of a $22,500 fee. This report was false, as Defendants knew or should have known. There was no fee due and the event planner had been overpaid. Defendants failed to properly validate this statement. In fact, GBF advised Defendants that she was paid more than she was owed prior to publication of the article. Defendants chose not to include GBF's position in its article.

d. Defendants falsely reported that "[u]nbeknownst to the public, however, is how many of these parties have left a trail of controversy." This statement was false, as Defendants knew, and wrongly implied that Defendants have information that a large number of the BGBG parties have been embroiled in controversy. This is not accurate, and indeed, GBF's events have been overwhelmingly positive and successful. In just its second year, 2010, BGBG was named the Number One Event at the Super Bowl by ESPN The Magazine. Indeed, GBF's event consistently has been hailed by hundreds of media outlets as the best at the Super Bowl, year in and year out.

e. Defendants falsely reported that "[t]his pattern of turmoil is attested to by hundreds of pages of documents and dozens of people who spoke to Sportico for this story, most on the condition that they not be identified, for fear of retribution." This statement is false, as Defendants knew. Mr. Pollick has never taken "retribution" against any employee at any time, has not threatened to do so, and has not been reported as doing so.

f. Defendants falsely reported that "[t]he year before, the party in conjunction with the LA Super Bowl took place in the Metaverse—with some fairly adverse results . . . [.]" This statement was false, as Defendants knew. The event had been hosted by Rob Lowe, was the first Super Bowl event ever held in the Metaverse, and went very well. As one example only, Meta had donated to GBF its substantial work on the virtual stadium worth more than $2 Million and after the event donated the entire virtual stadium to GBF.

g. Defendants falsely reported that "[a]ll of a sudden, Pollick was presented with dueling objectives: the unassuming work running a fiscal sponsor for nonprofit clients, and the more glamorous job of rubbing elbows with A-listers on Super Bowl weekend. In time, according to a number of those who worked for Pollick, the latter came to outstrip the former." This statement is false, as Defendants knew. Mr. Pollick's focus is and has always been on the running of GBF and its philanthropy. The BGBG events attended by celebrities raised money not only for their own charities but also for GBF to allow it to pay salaries to its employees and to fund GBF's Fund for the Advancement of Philanthropy. This fund has allowed GBF to support start-up nonprofits with limited funds and other missions.

h. Defendants falsely reported, to support its claim that GBF was spending beyond its means, "[a]ccording to a copy of Wahlberg's hosting agreement *Sportico* obtained, GBF agreed to provide a private jet—specifically, an Embraer Legacy 600 aircraft—to shuttle the actor and up to a dozen guests from New Orleans to Los Angeles, to Phoenix, and then back to New Orleans." This statement falsely implied that GBF paid for the private jet, which was is not true, as Defendants knew. The private jet was donated for the event and GBF has never paid for a private jet for any celebrity.

i. Defendants falsely reported that "[w]hile GBF has followed through on some of its celebrity appearance commitments for last year—Connie Watt, the mother of J.J. Watt, confirmed that their organization received its $100,000 remittance—representatives of Ray Lewis and Patrick Willis say they have not received their shares. And the Giving Back Fund's board now suggests it is not inclined to make good on those. This statement was false, as Defendants knew. These individuals were not paid because GBF never agreed to pay them and, like other celebrities, they donated their time to the event.

33. All of the above statements are false and defamatory. Defendants published all of the above false statements with actual malice, a knowing or reckless disregard of the truth, and/or negligently.

34. In pursuit of a preconceived and sensationalistic agenda, Defendants carefully tailored their information gathering to rely only upon biased individuals, and willfully failed to review public and other information available to them that would have disproven the information relied upon. In short, Defendants deliberately decided to portray GBF as a failing entity and Mr. Pollick as a bad actor.

35. Defendants' numerous defamatory statements reached people across the country, and beyond, including in Massachusetts, via Defendants' self-described "robust" network, and

resulted in harm to both GBF and Mr. Pollick's reputations in Massachusetts and across the country.

**Sportico's and Mr. Libit's Interference with GBF's and Mr. Pollick's Business**

36. As alleged above, Defendants intentionally released their February 8, 2024 article one day before GBF's 2024 BGBG, which was to be hosted by the internationally known comedian Kevin Hart. Mr. Libit reached out to Mr. Hart's representative for comment prior to publishing the article. Mr. Libit knew at the time that he contacted Mr. Hart's representative that Mr. Hart was scheduled to host the BGBG.

37. Mr. Libit advised Mr. Hart's representative that he was about to publish a negative article about GBF, Mr. Pollick, and the BGBG. Upon information and belief, Mr. Libit advised Mr. Hart's representative of numerous falsities of and concerning GBF and Mr. Pollick in order to convey the false message that BGBG was a financial disaster and worse.

38. As a result of Mr. Libit's false statements to Mr. Hart's representative, Mr. Hart drastically reduced his role and profile at the event. Mr. Hart instructed GBF that (1) GBF could not use his name or likeness in promoting the 2024 GBGBG event; (2) GBF could not inform anyone that Mr. Hart would be hosting the event; and (3) GBF could not put GBF signage at the event—which was GBF's own event.

39. As a result of Mr. Hart's limitations, GBF was unable to properly promote the BGBG event. Because of Mr. Libit's interference, revenue from the event was substantially decreased.

40. Mr. Libit's interference destroyed the prior advantageous relationship between GBF and Mr. Hart.

## V. COUNTS

### COUNT I - DEFAMATION

**The Giving Back Fund, Inc. and Marc Pollick v. Defendants**

41. Plaintiffs repeat and reallege here all of the allegations set forth above.

42. Sportico and Mr. Libit published their false and defamatory statements of and concerning Plaintiffs with actual malice—a knowing or reckless disregard of the truth. Plaintiffs are not public figures nor are they limited purpose public figures such that they need only prove Defendants' negligent publication.

43. Sportico and Mr. Libit's defamatory statements of and concerning Plaintiffs were defamatory per se.

44. Sportico and Mr. Libit's defamatory statements damaged GBF and Mr. Pollick for which Sportico and Mr. Libit are liable.

### COUNT II – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

**The Giving Back Fund, Inc. v. Defendants**

45. Plaintiffs repeat and reallege here all of the allegations set forth above.

46. GBF had a business relationship with Mr. Hart.

47. Mr. Libit was aware of GBF's business relationship with Mr. Hart.

48. Mr. Libit intentionally contacted Mr. Hart on behalf of Sportico in order to publish false and defamatory statements regarding GBF and Mr. Pollick to him in order to cause damages to GBF and to further Defendants' false story. Mr. Libit acted intentionally with the improper motive of undermining GBF's relationship with Mr. Hart and to harm GBF.

49. As a result of Mr. Libit's interference, Mr. Hart significantly curtailed his involvement with GBF.

50. GBF suffered harm as a result of Mr. Libit's interference with GBF's business agreement with Mr. Hart including lost business and lost income.

**COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Marc Pollick v. Defendants**

51. Plaintiffs repeat and reallege here all of the allegations set forth above.

52. Defendants knew and intended that their publication of false statements concerning Mr. Pollick and the GBF would cause Mr. Pollick emotional distress.

53. Defendants' conduct as set forth above was extreme and outrageous and beyond the bounds of common decency.

54. Mr. Pollick suffered severe emotional distress as a result of Defendants' conduct.

55. Mr. Pollick's severe emotional distress, caused by Defendants' intentional, malicious conduct, was of such a nature that no reasonable person could be expected to endure it.

56. Defendants' actions resulted in damages to Mr. Pollick, including ongoing severe emotional distress and monetary losses.

**COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**Marc Pollick v. Defendants**

57. Mr. Pollick repeats the allegations set forth above as if fully contained herein.

58. Defendants took actions that they knew or should have known would cause Mr. Pollick emotional distress.

59. Mr. Pollick suffered severe emotional distress as a result of Defendants' negligent conduct, including without limitation causing him nausea, loss of appetite, sleeplessness, and anxiety.

60. A reasonable person would have suffered emotional distress as a result of Defendants' actions.

61. Defendants' actions resulted in damages to Mr. Pollick, including ongoing severe emotional distress and monetary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs The Giving Back Fund, Inc. and Marc Pollick respectfully request that this Court:

i. enter judgment in favor of Plaintiffs and award Plaintiffs damages on the counts set forth above;

ii. order injunctive relief requiring Defendants to immediately remove the articles referenced in Paragraphs 23, 26, and 29 from the Sportico website and any other medium in which they published or referenced the articles and preventing Defendants from disseminating the articles further;

iii. award The Giving Back Fund, Inc. and Marc Pollick their attorneys' fees and costs; and

iv. grant such other and further relief as the Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

Date Filed 6/4/2026 6:25 PM
Superior Court - Suffolk
Docket Number

THE GIVING BACK FUND AND
MARC POLLICK,

By their attorneys,

*/s/ Howard M. Cooper*

Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Maria T. Davis (BBO # 675447)
mdavis@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated: June 4, 2026

# EXHIBIT 5

Date Filed 6/4/2026 6:25 PM
Superior Court - Suffolk


# CIVIL ACTION COVER SHEET

DOCKET NUMBER

Massachusetts Trial Court
Superior Court

2

COUNTY: Suffolk Superior Court

| | | | |
|---|---|---|---|
| **Plaintiff** | The Giving Back Fund, Inc. | **Defendant:** | Sportico Media, LLC |
| ADDRESS: | 500 Commercial Street | ADDRESS: | 11355 W. Olympic Blvd. |
| | Boston, MA 02109 | | Los Angeles, CA 90064 |
| **Plaintiff:** | Marc Pollick | **Defendant:** | Daniel Libit |
| ADDRESS: | 500 Commercial Street | ADDRESS: | 11355 W. Olympic Blvd. |
| | Boston, MA 02109 | | Los Angeles, CA 90064 |
| **Plaintiff Attorney:** | Howard M. Cooper, Esq. | **Defendant Attorney:** | kg |
| ADDRESS: | Todd & Weld LLP | ADDRESS: | |
| | One Federal Street, 27th Floor | | |
| | Boston, MA 02110 | | |
| BBO: | 543842 | BBO: | |
| **Plaintiff Attorney:** | Maria Davis, Esq. | **Defendant Attorney:** | |
| ADDRESS: | Todd & Weld LLP | ADDRESS: | |
| | One Federal Street, 27th Floor | | |
| | Boston, MA 02110 | | |
| BBO: | 675447 | BBO: | |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B15 | Defamation | A | ☒ YES ☐ NO |

***If "Other" please describe:**

**Is there a claim under G.L. c. 93A?** ☐ YES ☒ NO

**Is there a class action under Mass. R. Civ. P. 23?** ☐ YES ☒ NO

**STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

**TORT CLAIMS**

A. Documented medical expenses to date
1. Total hospital expenses
2. Total doctor expenses
3. Total chiropractic expenses
4. Total physical therapy expenses
5. Total other expenses (describe below)

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages
F. Other documented items of damages (describe below)

TOTAL (A-F): $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|

| | | |
|---|---|---|
| 1. | Defamation and tortious interference with business relationships resulting in reputational and monetary damages $1,000,000.00+ | |
| | Total | $1,000,000.00+ |

Signature of Attorney/Self-Represented Plaintiff: X /s/ Howard M. Cooper, Esq    Date: June 4, 2026

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION UNDER S.J.C. RULE 1:18(5)**

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18: Uniform Rules on Dispute Resolution, requiring that I inform my clients about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney: X /s/ Howard M. Cooper, Esq.    Date: June 4, 2026

# CIVIL ACTION COVER SHEET INSTRUCTIONS — SELECT A CATEGORY THAT BEST DESCRIBES YOUR CASE*

**AC Actions Involving the State/Municipality†***

AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. (A)
AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. (A)
AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. (A)
AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. (A)

**CN Contract/Business Cases**

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal Affairs of Entities (A)
BA3 Liability of Shareholders, Directors, Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

* See Superior Court Standing Order 1-88 for an explanation of the tracking deadlines for each track designation: F, A, and X. On this page, the track designation for each case type is noted in parentheses.

†* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

‡ Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c. 231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

**PA Civil Actions Involving Incarcerated Party ‡**

PA1 Contract Action involving an Incarcerated Party (A)
PB1 Tortious Action involving an Incarcerated Party (A)
PC1 Real Property Action involving an Incarcerated Party (F)
PD1 Equity Action involving an Incarcerated Party (F)
PE1 Administrative Action involving an Incarcerated Party (F)

**TR Torts**

B03 Motor Vehicle Negligence - Personal Injury/Property Damage (F)
B04 Other Negligence - Personal Injury/Property Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical (A)
B07 Malpractice - Other (A)
B08 Wrongful Death - Non-medical (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

**RP Summary Process (Real Property)**

S01 Summary Process - Residential (X)
S02 Summary Process - Commercial/ Non-residential (F)

**RP Real Property**

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

**MC Miscellaneous Civil Actions**

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10, § 28 (X)

**AB Abuse/Harassment Prevention**

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E (X)

**AA Administrative Civil Actions**

E02 Appeal from Administrative Agency, G.L. c. 30A (X)
E03 Certiorari Action, G.L. c. 249, § 4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8 (X)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12, § 11H (A)
E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) (X)
E94 Forfeiture, G.L. c. 265, § 56 (X)
E95 Forfeiture, G.L. c. 94C, § 47 (F)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B (F)
Z02 Appeal Bond Denial (X)

**SO Sex Offender Review**

E12 SDP Commitment, G.L. c. 123A, § 12 (X)
E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

**RC Restricted Civil Actions**

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S (X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

## STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** — On the face of the Civil Action Cover Sheet (or on attached additional sheets, if necessary), the plaintiff shall state the facts on which the plaintiff relies to determine money damages. A copy of the completed Civil Action Cover Sheet, including the statement concerning damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT** — If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with the defendant's answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT. IF THIS COVER SHEET IS NOT FILLED OUT THOROUGHLY AND ACCURATELY, THE CASE MAY BE DISMISSED.**

# EXHIBIT 6

MS

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT DEPT. OF THE TRIAL COURT

| | |
|---|---|
| THE GIVING BACK FUND, INC. and MARC POLLICK<br><br>Plaintiffs,<br><br>v.<br><br>SPORTICO MEDIA, LLC and DANIEL LIBIT<br><br>Defendants. | CIVIL ACTION NO. 2684CV01663 |

**AMENDED COMPLAINT AND JURY DEMAND**

**i. Introduction**

1. Plaintiffs, The Giving Back Fund, Inc. ("GBF") and its President and Founder Marc Pollick ("Mr. Pollick") (together "Plaintiffs"), bring this action for, *inter alia,* defamation and tortious interference with advantageous business relations against Defendants, Sportico Media, LLC ("Sportico") and Daniel Libit ("Mr. Libit") (together "Defendants"). Plaintiffs seek to recover damages necessary to make them whole for the substantial harm Defendants caused them as a result of Defendants' publication in bad faith, negligently and/or with a knowing or reckless disregard of the truth, numerous false and defamatory lies concerning Plaintiffs, and injunctive relief requiring Defendants to immediately remove and cease dissemination of the articles. GBF is a non-profit, charitable organization which has been led by Mr. Pollick since its inception in 1997. Until Defendants undertook their unlawful defamation campaign, both GBF and Mr. Pollick had long enjoyed hard-earned and well-deserved stellar reputations. Defendants'

lies, including their lies about Plaintiffs' important charitable endeavors, unlawfully and substantially damaged Plaintiffs' reputations and caused other injuries. Defendants are liable for damages for their wrongdoing and the harm they caused.

## ii. Parties

2. Plaintiff GBF is a Massachusetts nonprofit corporation with a principal place of business located at 500 Commercial Street in Boston, Suffolk County, Massachusetts. As a Massachusetts based non-profit, GBF is subject to oversight within the Commonwealth.

3. Plaintiff Mr. Pollick is an individual and the founder and President of GBF.

4. Defendant Sportico is a Delaware corporation with a principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, California 90064. At all times relevant hereto, including during much of its unlawful defamation campaign, Sportico was registered to do business in the Commonwealth.

5. Defendant Mr. Libit is an individual who upon information and belief resides in Chicago, Illinois. Mr. Libit regularly publishes pieces he authors into the Commonwealth including the defamatory publications at issue here.

## iii. Jurisdiction and Venue

6. The exercise of personal jurisdiction over Sportico and Mr. Libit is lawful and proper where Defendants published their false and defamatory statements attacking Plaintiffs on the Sportico digital platform by which Defendants intended to and did in fact reach audiences in Massachusetts. Defendants knowingly published into Massachusetts, knowingly solicited individuals in Massachusetts for Defendants' false and defamatory stories, and were fully aware that their false and defamatory statements would cause injury to Plaintiffs here.

7. Venue is lawful and proper in Suffolk County because Defendants' false and defamatory statements caused injury to Plaintiffs here and because GBF is a Massachusetts public charity.

## iv. Facts

### About The Giving Back Fund and Mr. Pollick

8. Mr. Pollick founded GBF in 1997 with the goal of helping professional athletes, celebrities, high-net-worth individuals, corporations, and others establish and maintain charitable foundations according to best practices in philanthropy.

9. GBF is a non-profit organization that provides philanthropic consulting, management and administrative services to donors. Among many other things, GBF strives to and succeeds in helping its donors make the greatest charitable impact possible.

10. GBF's commitment to its mission and to its donors has been a success. Over nearly three decades, GBF has launched and assisted more than 1,000 foundations and other charitable entities. It has facilitated more than one billion dollars in donations and grants to thousands of causes across the world.

11. GBF has supported causes including, without limitation, researching cures for numerous diseases, treatment of mental health disorders, earthquake relief, education for women and girls in Africa, scholarships, fighting discrimination, and hundreds of other important causes.

12. GBF has had the opportunity to work with funds established by individuals including Yao Ming, Doug Flutie, Jim Brown, Pelé, Steve Gleason, Jalen Rose, Magic Johnson, Damar Hamlin, Britney Spears, Justin Timberlake, and Cara Delevingne, among hundreds of other well-known and prominent individuals.

13. GBF continues to work tirelessly in pursuit of its mission to expand the number of people and the amount of resources dedicated to charitable giving.

14. One of the ways in which GBF works to carry out its mission is by hosting events to raise funds for charities. GBF's signature event, held every year between 2009 and 2024 (other than when affected by Covid), has been the "Big Game Big Give" ("BGBG") event held during the week of the Super Bowl.

15. The BGBG is hosted by celebrities who volunteer their participation in exchange for a contribution to the celebrity host's chosen charity. The event has raised over $11 million dollars and benefited numerous charities around the country. Celebrities including, without limitation, Michael Bay, Jamie Foxx, Mark Wahlberg, Joe Montana, Rob Lowe, Jay Leno, Ashton Kutcher and Demi Moore, Alec Baldwin, Hilary Swank, David Schwimmer, Michael Phelps, and The Black Eyed Peas have hosted the event in the past. Sponsors of the BGBG have included J.P. Morgan, Goldman Sachs, AOL, Aston Martin, BMW, Lamborghini, USA Today, and Forbes, among other well-known companies.

16. GBF produces its BGBG event (and others) on a relatively modest budget and relies on the significant donations of others to put on the event. GBF's BGBG event consistently has been viewed as a spectacular success and is repeatedly attended by many of the same guests, donors, and participants. Director Michael Bay has hosted it without charge four times, as has Academy Award Winner Jamie Foxx. There have been more than 1000 articles and news media coverages of the event praising its success and impact. In just the BGBG's second year, ESPN The Magazine named it the Number One event of Super Bowl week.

17. While GBF's reach is international, it is a Massachusetts charitable organization based in Boston. Since its inception, its employees and past and present board members have

included numerous respected members of the Massachusetts community. At the time Sportico wrote its articles about GBF, GBF's board Chair was Prashanth Palakurthi and its Chief of Staff was Ingrid Tucker, both Massachusetts residents. Its board included other Massachusetts residents, including Alan Dershowitz, Arnold Hiatt, Charles Ogletree, Paul Weiler, Prof. Stephen Greyser, Steve Grossman, Jonathan Kozol, Joyce Kulhawik, Rabbi Harold Kushner, Paul Schervish, Michele Courton-Brown, and John Morton.

**About Sportico**

18. Penske Media Corporation is a global media conglomerate ("Penske Media"). Penske Media launched Sportico in 2020. Sportico styles itself as a media news platform and professes on its website to be "the premier destination for professionals and informed readers seeking authoritative news and analysis on the $500 billion global sports industry." Sportico further touts itself as providing news and analysis "covering every facet of the business of sports" through its "robust digital platform, newsletters, and live events." In fact, Sportico is a sensationalistic outlet willing to knowingly publish falsehoods as alleged herein in order to increase its audience.

19. Sportico's digital business model includes its digital advertising strategy that depends on generating web traffic, including online traffic from Massachusetts visitors. Sportico also earns revenue through soliciting subscription fees for users, including Massachusetts consumers, who must pay in order to gain access to articles placed behind paywalls on Sportico's platform.

**Sportico and Mr. Libit's Defamation of GBF and Mr. Pollick**

20. In or about 2023, Sportico and Mr. Libit conceived of and began a months long defamation campaign targeted at GBF and its founder, Mr. Pollick. Defendants did so relying

upon obvious unreliable and biased sources, unreliable and false information, and by purposefully avoiding or minimizing truthful information that did not fit their preconceived agenda. As one example only, as a result of Defendants' publication of their first defamatory story, GBF commissioned an independent investigation by a prominent Boston law firm into various allegations that were published by Sportico taken from a purported "whistleblower" letter Sportico had received without the knowledge or permission of its author. The results of that investigation completely exonerated Mr. Pollick of every allegation against him. Rather than report that Mr. Pollick had been exonerated, however, Defendants fabricated a bold headline publishing the opposite in yet a second defamatory article and continued to report on the already investigated and disproven facts, all in an effort to harm GBF and Mr. Pollick. Importantly, the investigation was conducted by Boston, Massachusetts based legal counsel. Defendants communicated with Boston counsel in the course of creating their false and defamatory publication.

21. Sportico and Mr. Libit published numerous damaging false and defamatory statements of alleged fact regarding both GBF and Mr. Pollick, some of which were knowingly and recklessly fabricated or which were published negligently. Worse, Sportico and Mr. Libit continued to publish in blatant disregard of the actual facts after the actual facts were provided to them.

22. Upon information and belief, there were two main sources for Defendants' information. The first, upon information and belief, was a known and obviously disgruntled former professional whom GBF had terminated its relationship with, whose bias was clear from publicly available sources including a lawsuit, and who had threatened GBF and Mr. Pollick in writing for having terminated him. The second, upon information and belief, was a disgruntled

former GBF board member who had been asked to step down from the board for cause and resigned only when faced with a board meeting specifically called to vote on whether to remove her from the board for cause, where all board members were expected to vote for her removal.

23. Some of the specific false and misleading allegations in Defendants' three (3) articles are set forth below, without limitation.

24. As is well known, GBF is an extremely well-run and effective charity. Over the past 29 years, under Mr. Pollick's leadership, GBF has created more than 1,000 foundations all over the world and has facilitated the distribution of more than *one billion dollars* to people in desperate need. GBF's taxes are prepared annually by national CPA firms, and its financial reports have passed their carefully audited inspections for 29 consecutive years. *Not once*, until the appearance of Defendants' false and defamatory articles, has anybody accused Mr. Pollick of having been dishonest, or of having engaged in fraud, financial wrongdoing, employee harassment, or any other nefarious conduct whatsoever. To the contrary, all prior reporting on GBF and Mr. Pollick over the past three decades—including hundreds of magazine and newspaper articles—have lauded GBF and Mr. Pollick's tireless work for charities and people in need.

25. On May 1, 2023, Sportico and Mr. Libit published its first article written by Mr. Libit. Defendants published this article under the false and defamatory headline "**Damar Hamlin's Charity Sponsor, the Giving Back Fund, Embroiled in Strife.**" Defendants published their article on the Sportico website, www.sportico.com/business/sports/2023/damar-hamlin-charity-sponsor-giving-back-fund-1234721053/. The headline was false and defamatory and known by Defendants to be false and defamatory. Defendants published the article into Massachusetts.

26. In their article, Mr. Libit and Sportico knowingly made numerous false statements regarding GBF and Mr. Pollick in order to falsely portray GBF as "an organization in strife and falling short of its sterling reputation[,]" with Mr. Pollick falsely portrayed as "the primary source of discontent." Defendants also reported false statements made almost exclusively anonymously by people who would not go on the record. Defendants made these false statements without speaking to anyone on the current GBF board except its Chairman, Mr. Palakurthi, who vigorous defended Mr. Pollick and expressed his, and the board's, full confidence in Mr. Pollick's leadership, and without speaking to the many GBF clients who would have told Sportico a very different story.

27. Incredibly, Mr. Libit did so by affirmatively reaching out to former GBF employees, including those living in Massachusetts, not just to ask for objective information as a reporter would normally do, but under the cover of an initial written communication promising anonymity for anyone willing to respond. Upon information and belief, Mr. Libit reached out almost exclusively to former employees who had been terminated and who he was told were aggrieved. Defendants' actions in this regard were an extraordinary departure from normal and acceptable journalism. Indeed, offering a possible source anonymity before ever speaking with them is direct evidence of actual malice in that it is a reckless invitation to entertain specious information by making clear to the source they will not face any consequences in providing it.

28. Specifically, Mr. Libit's message to those former employees receiving his communication stated:

> I am a reporter for Sportico, the sports business publication, working on a story about the Giving Back Fund. I've heard from sources about a lot of turmoil and issues within the organization. Hoping to confirm/learn some things from you. Happy to grant you anonymity, as I have with other sources. Please message or call me at your earliest convenience.

A copy of his message is attached as ***Exhibit A***.

29. Mr. Libit's communication also establishes Defendants' pre-conceived agenda of soliciting information only from former employees—employees who, on information and belief had been terminated and likely to be disgruntled—whom he hoped, given the promised anonymity, would report turmoil in exchange for no accountability for their statements.

30. Defendants' knowingly false statements in the first article which are at issue here include but are not limited to the following:

a. Defendants falsely reported that GBF's "2021 tax return's statement of functional expenses contained numerous empty categories on line items such as legal, accounting and benefits paid to current top employees. These had previously been filled out in earlier returns. The organization reported spending about $3.4 million on "professional fees" in 2021, yet included no names in the section of the tax return for independent contractors earning at least $100,000." These statements were false, omit material information, and are misleading, as Defendants knew. GBF's tax returns have been prepared by reputable national firms and approved by its long-time certified public accountant, board, treasurer, and finance committee. GBF's tax returns have also passed 28 consecutive outside audits without ever receiving a single management letter.

b. Defendants falsely reported that "[m]ultiple staffers and former clients say it has been a common occurrence for earmarked donations to be initially placed in the wrong accounts." This statement was false and misleading, as Defendants knew. While donations often arrive at GBF with no designation, GBF is scrupulous in reaching out to track down each donor to ensure that their donation, often made anonymously, is credited to the exact foundation for which it was intended.

c. Defendants falsely reported that "[w]hile touting itself as 'more than a fiscal sponsor,' former employees say GBF has long struggled to carry out the basic functions of a fiscal sponsor: depositing charitable contributions, keeping track of the money and providing solicitation notices to donors. Even the job of reconciling client accounts has proven to be an ever-elusive challenge. Of the 168 accounts that GBF had on its books last summer, only a third were considered 'in good standing,' internal documents show." These statements were false and based on a misinterpretation of internal records that Defendants improperly sourced, as Defendants knew. GBF has been responsible for over 1,000 foundations, each of which required and received proper financial management.

d. Defendants falsely reported that "[m]any clients had to fight for a long time,' one former employee said. 'Most of them that I have seen ended up reaching some sort of compromise where they leave a lot of money at the Giving Back Fund.'" This statement was false, as Defendants knew. No client has ever had to fight for their money and no client has ever "left a lot of money" at GBF.

e. Defendants falsely reported that "[o]n the other end of the spectrum are clients like the Yao Ming Foundation, which multiple staffers say has effectively operated as a dormant GBF project for the last decade, while still shelling out some of the highest client fees. Yao's charity, launched in 2008 as a response to the deadly Sichuan earthquake, had been paying GBF $5,000 a month through mid-2021, when its fee was cut to $4,000 a month. (Messages left with Yao's agency, WME, did not receive a response.)." This statement was false and misleading, as Defendants knew. Mr. Ming's foundation is not dormant and receives significant donations every year and has made and received hundreds of thousands of dollars in grants in recent years.

f. Defendants falsely reported a "whistleblower's" statement that Mr. Pollick "had been barred from renting vehicles through Hertz because of a long-ago surcharge for damaging a rental vehicle that he wouldn't make good on." This statement was false as Defendants knew and were told in advance of publication. A Hertz representative collected the car from Mr. Pollick after a tire went flat and returned it to the wrong Hertz location. Hertz thought that it was Mr. Pollick who had returned the car to the wrong location and thus erroneously added a fee to his bill. The error was corrected and Mr. Pollick was not charged and in fact owed nothing.

g. Defendants falsely reported the whistleblower's statement that in order to cancel airfare without a charge, Mr. Pollick would "sometimes l[ie] to say he had Covid" and that they were "not comfortable lying for him, so he would have me patch him in after waiting on hold. I booked and canceled the same pre-BGBG trip for him around 5 separate times." This statement was false, as Defendants knew. Mr. Pollick never lied to cancel or reschedule anything and only canceled trips when the client he was traveling to visit asked to reschedule.

h. Defendants falsely reported that the whistleblower had reported "[e]mployees are scared of [Mr. Pollick's] retribution," and falsely reported that the same sentiment was "echoed by each of the two dozen former staffers who spoke to Sportico." This statement was false, as Defendants knew or should have known. Mr. Pollick has never taken "retribution" against any employee at any time, has not threatened to do so, has not been reported as doing so, and employees are not "scared" of him. This statement by Defendants is false.

i. Defendants falsely reported that GBF board member Joanne Pasternack quit the board and that her departure "closely followed those of two other directors, Danny Hughes and Keeley Mooneyhan." These statements were false and misleading. Ms. Pasternack resigned only when faced with a Board Meeting specifically called to vote on whether to remove her from the board for cause, where all board members were expected to vote for her removal. At that time Ms. Pasternack had already been asked to step down twice and did not willingly "quit." Mr. Hughes left, after Ms. Pasternack and not before, simply because his board term was over. Ms. Mooneyhan had left eight months before Ms. Pasternak because she had lost her job. Defendants' insinuation that there was a resignation of multiple board members *en masse* reflected a broader concern and was therefore false and misleading.

j. Defendants negligently and/or with actual malice reported that GBF's "[i]nternal documents also showed that in April 2020, GBF reimbursed NEXUS for a $41,800 payment it made to Spark Neuro, the company owned by the husband of NEXUS co-founder Rachel Gerrol, to rent office space in New York City. Former employees say they were troubled by what they perceived as a potential conflict of interest, but that it didn't matter." This statement was false, misleading, and omitted material information, as Defendants knew and were told in advance of publication. Ms. Gerrol's husband had given NEXUS office space at a substantial discount to save NEXUS, a charity, money. There was no potential conflict or any mismanagement of funds. To the contrary, thousands of dollars were saved.

k. Defendants falsely reported that "Pollick's exhaustive list of personae non gratae includes some of his once-closest confidants." This statement was false, as Defendants knew. Mr. Pollick did not have an exhaustive list of personae non gratae including some of his once-closest confidants and the only example Defendants provided was a lawyer whom GBF sued and settled against based on his breach of duties to GBF.

l. Defendants falsely reported, after making a series of false and defamatory statements, "And yet, Pollick's public image has endured unscathed[,]" implying that there would be a reason for Mr. Pollick's reputation to have been harmed. This statement was false and misleading, as Defendants knew. As set forth above, Mr. Pollick has successfully led GBF for 29 years, has created more than 1,000 foundations all over the world, and has facilitated the distribution of more than one billion dollars. He has never been accused of or found to have been dishonest, of having engaged in fraud, having engaged in employee harassment, or having conducted any other form of criminal wrongdoing.

m. Defendants falsely reported that "[i]n 2002, the Giving Back Fund made headlines when it filed a $15 million lawsuit against Britney Spears' former lawyer, Mark Steverson, following the pop star's decision to end her relationship with the GBF[,]" implying that GBF's lawsuit was motivated by Ms. Spears' decision to leave GBF. This statement was false, misleading, and omits material information, as Defendants knew. The lawsuit was based on the insistence of Mr. Steverson, who was a GBF board member, on using charitable funds for non-charitable purposes. GBF's board voted 14-0 to remove Mr. Stevenson as a board member and brought a publicly accessible lawsuit against him for breach of fiduciary duty and breach of loyalty. The case was settled almost immediately in favor of GBF.

n. Defendants falsely reported that its source was a "whistleblower letter," implying that the individual writing the letter had acted at their own risk to call out wrongdoing by GBF. This statement was false, misleading, and omits material information. The employee Defendants dubbed a "whistleblower" was terminated after being found to have engaged in malfeasance through the investigation of an independent outside law firm. That investigation also showed that the allegations in the letter were false. As set forth below, Sportico obtained this letter without the permission of the author and without the author's knowledge. The individual identified as the whistleblower

refused to confirm that they had written the letter during the investigation, has since withdrawn the allegations in their letter, and demanded that Sportico remove all references to the letter and any content contained in the letter.

o. Defendants falsely reported "[b]ut that is not the full story that emerges from interviews with dozens of sources—including clients, donors, contractors, board members and 24 former GBF employees—as well as a review of hundreds of pages of internal documents. Collectively, they portray an organization struggling to carry out basic oversight and accounting functions, and steeped in fear of its leader." This statement is false, misleading, and omits material information, as Defendants knew or should have known. Defendants implied they had significant sources that supported their false claim but only reported on limited sources whose narratives fit their story. Defendants omitted or did not seek information from numerous individuals from the 29-year-old GBF who would have truthfully and vigorously supported GBF and Mr. Pollick.

p. Defendants falsely reported a statement from Lisa Greer, who falsely reported that "at Pollick's solicitation, joined GBF's board as its president in 2021 before quitting three months later." Defendants also published the false statement from Ms. Greer "I encountered a great deal of resistance and great deal of anger with just trying to help the organization." These statements were false, misleading, and omitted material information, as Defendants knew or should have known. Ms. Greer was recruited as GBF's Chair (and not president), a role in which she served for only three months before she was asked to resign for improper conduct. Ms. Greer's opinion was not representative of GBF's other board members and employees, many of whom were longstanding board members and employees.

q. Defendants falsely reported that a sign of strife was that GBF had a falling out with its longtime counsel, Andrew Morton. These statements were false and misleading, as Defendants knew. Attorney Morton was not a longtime counsel, was not on retainer with GBF, and was solely consulted from time to time on minor legal matters.

r. Defendants falsely reported that Attorney Morton "delivered a number of his athlete clients to the organization." This statement is false, as Defendants knew or should have known. Attorney Morton never delivered any client to GBF.

s. Defendants falsely reported "But GBF—having shuffled through several compliance companies over the last year—had been delinquent with its charity registrations in multiple states, according to multiple sources familiar with the situation." This statement is false and misleading, as Defendants knew or should have known. GBF did not "shuffle" through several compliance companies, it sought a new company when its long term compliance company was no longer suitable and its first replacement was not a good fit for GBF. GBF retained its current firm which brought GBF compliant that same day.

t. Defendants falsely reported that "[e]arlier this year, Pollick settled a three-year-old lawsuit he filed against the Diplomat Beach Resort in Hollywood, Fla., which he

originally sued for injuries and lost wages he claimed he suffered after colliding with a sliding glass door while staying at the hotel in 2019. At the time, Pollick was in Florida scouting a location for an upcoming Big Game Big Give party. Pollick, who receives an annual salary of around $250,000, eventually dropped his lost-wages claim, which could have required him to submit to discovery related to GBF's business." This statement is false and misleading, as Defendants knew, because it implied that Mr. Pollick dismissed his lost wages claim to avoid having to produce discovery related to GBF's business. There is no factual basis for this implication.

u. Defendants falsely reported that "Pollick's on-the-fly desire to sign up new clients led to a capricious fee structure, the former staffers say." This statement is false, as Defendants knew or should have known. Mr. Pollick did not and does not set client fees. Fees are set by the leadership team as a whole, through consensus.

31. Many of the statements in the May 1, 2023 article were attributed to a letter written by a purported whistleblower, (the "Complaining Employee"), which was sent to a GBF board member, Joanne Pasternack. Around this same time, GBF's board had demanded that Ms. Pasternack step down from the board based upon her misconduct. Ms. Pasternack initially refused to do so. Ultimately, she was allowed to resign when faced with a board meeting specifically called to vote on whether or not to remove her from the board for cause—a vote in which all board members had agreed to unanimously vote for her removal.

32. As Defendants also well knew prior to publication, the supposed whistleblower was in fact a disgruntled employee who had recently been demoted for poor performance. That Complaining Employee, while providing their letter to Ms. Pasternack, never authorized their letter to be disseminated to Mr. Libit, Sportico, or any other media entity, and since Defendants' original defamatory publication has disavowed their letter and demanded Defendants withdraw it. Defendants have ignored their request and continue through today to publish their defamatory article about it.

33. Mr. Libit did not have any support for the statements in the Complaining Employee's letter and nothing in the letter indicated that the Complaining Employee's statements were credible. Nonetheless, Mr. Libit relied on the statements, without obtaining valid support,

in order to write a spurious article about GBF and Mr. Pollick—despite GBF advising Mr. Libit prior to publication that many of the statements in the letter were false.

34. On May 27, 2026, the Complaining Employee wrote to tell Mr. Libit and Sportico not only that they had not been authorized to obtain and rely on the letter, *but that they did not have first-hand knowledge of the information communicated and that allegations in the letter were incorrect, exaggerated and/or without basis in fact.*

35. Specifically, the Complaining Employee wrote:

> My name is [Complaining Employee]. It has come to my attention that you published in Sportico a letter I wrote to my then-employer, The Giving Back Fund, Inc., regarding that company and its CEO, Marc Pollick. I also understand that in your articles you quoted my letter and made repeated references to it.
>
> ***Please be advised that I did not give Sportico or Mr. Libit permission to use my letter, or to publish my letter, or to quote or reference my letter in the articles. I still do not give any such permissions to Sportico or Mr. Libit. Further, I did not send my letter to Sportico, nor did I give anyone permission to send my letter to Sportico.*** That letter was intended to be confidential to the addressees. In fact, in the course of writing these articles Mr. Libit reached out to me and I specifically informed him that I declined to be involved in any way.
>
> Further, please be advised that ***there were certain allegations in my letter which were incorrect, exaggerated and/or for which I did not have facts to base them.*** I regret writing that letter in that form because of this. If I could turn back the clock, I would not have submitted that letter in that form.
>
> I cannot turn back the clock, of course, but to fix any problems I may have inadvertently caused ***I wish for Sportico to promptly remove my letter from its website and from its articles, to remove any quotations Sportico may have used from my letter, and to remove any references to my letter from the Sportico website and its articles.*** I reserve all rights, but at a minimum please abide by my request herein.

(Emphasis added). A copy of the Complaining Employee's letter is attached at ***Exhibit B***.

36. Nonetheless, despite this direct and unambiguous warning about falsity, Defendants have continued to publish their defamatory articles.

37. As set forth above, following Sportico and Mr. Libit's dissemination of the May 2023 article, at Mr. Pollick's request, GBF's board hired an independent Boston law firm, Rubin and Rudman LLP ("Rubin & Rudman"), to investigate the Complaining Employee's complaints, specifically, whether Mr. Pollick had acted in an illegal, unethical, inappropriate and unprofessional manner as alleged in Defendants' publication.

38. During the course of its investigation, Rubin & Rudman examined documents, interviewed GBF leadership, board members, and employees, including the Complaining Employee, and consulted with an executive coach.

39. Following completion of the investigation, Rubin & Rudman determined that the Complaining Employee's allegations were not substantiated and that "[a] review of various issues in their entirety concluded the lack of any improper action." Rubin & Rudman determined:

> [T]here is no substantiation to the allegations raised by [the Complaining Employee] against the [Mr. Pollick]. As such, there is no recommendation being made for disciplinary action against [Mr. Pollick]. Removal of ["Mr. Pollick"] from his position is not warranted or any other similar actions.

40. Rubin & Rudman further determined that it was appropriate for GBF to discipline the Complaining Employee, up to and including termination.

41. GBF terminated the Complaining Employee based on misconduct.

42. Despite Rubin & Rudman having exonerated Mr. Pollick of any wrongdoing whatsoever, and determining that termination of the Complaining Employee was proper and warranted, Sportico and Mr. Libit decided to write and disseminate a second false and defamatory hit piece about Mr. Pollick and GBF—including repeating the false statements contained in the already disproven letter.

43. Specifically, on July 11, 2023, Sportico and Mr. Libit published their second article, also written by Mr. Libit, falsely headlined "**Giving Back Fund Investigates CEO, Fires Whistleblower**" on its website, www.sportico.com/business/sports/2023/giving-back-fund-investigation-ceo-whistleblower-1234730092/.

44. Prior to publishing the article, Mr. Libit and Sportico emailed GBF to request information regarding topics addressed in the article. GBF and the Boston-based lawyer who conducted the internal investigation of GBF, Attorney Alfred Gray, responded fully to those questions.

45. Mr. Libit also reached out to Massachusetts-based GBF board chair Mr. Palakurthi and Massachusetts-based Chief of Staff Ms. Tucker.

46. Defendants' headline alone is both outrageous and defamatory per se. It communicates the opposite of the truth by informing readers falsely that Mr. Pollick was under investigation, when in fact it was Mr. Pollick himself who had requested the investigation, and that in response he had fired the alleged whistleblower. Significantly, prior to the article being written, the investigation had already been completed. It is well-established that many readers never read beyond the headline and, upon information and belief, Defendants used the false and defamatory headline as click bait in an effort to draw readers to their site through a sensationalized headline and to further defame Mr. Pollick and GBF. This too is actual malice.

47. In the second article, Mr. Libit and Sportico again made numerous false statements regarding GBF and Mr. Pollick and reported on the false statements of others without properly validating the statements.

48. Defendants' false statements in the second article at issue here include but are not limited to the following:

a. Defendants' headline for the article was itself false and misleading. The title implies that GBF conducted its own investigation, which was ongoing, and fired an individual in retaliation for their proper reporting of misconduct. This statement was false and misleading, as Defendants knew. GBF hired Rubin & Rudman LLP, an independent and respected law firm, to investigate the administrative assistant's complaints regarding GBF and Mr. Pollick. The investigation was already complete when the article was released and established that neither GBF nor Mr. Pollick had committed any wrongdoing. Further, the employee was terminated for misconduct.

b. Defendants falsely reported that "[t]he employee who spoke up, however, was dismissed." This statement was false, misleading, omitted material information, as Defendants knew, and implied that the employee spoke up to raise legitimate concerns and was wrongly terminated. No employee "spoke up" of any material wrongdoing and no GBF employee was ever dismissed because they made a complaint. The employee was properly terminated for performance issues and misconduct. Here, the employee at issue was terminated because of the reasons stated above, not because of any protected activity.

c. Defendants falsely reported that "[w]hat emerged was a behind-the-scenes picture of an organization that, despite its four-star [Charity Navigator Rating], has long struggled to carry out some of the basic functions of a philanthropic fiscal sponsor, often promises more than it can deliver and is routinely impaired by the combative and wayward tendencies of its leader." These statements were false and defamatory, as Defendants knew or should have known. As set forth above, GBF was and is a successful organization and owes much of its success to Mr. Pollick's dedication, leadership, and ability to attract and work with clients, charities, donors, and highly respected and prominent board members and advisory board members, many of whom have served proudly for more than 25 years.

d. Defendants falsely reported that "[t]he upshot of the investigation appears to maintain the status quo, with Pollick having weathered it without so much as a slap on the wrist." These statements were false, misleading, show bias and malice, and omitted material information, as Defendants knew, and implied that Mr. Pollick deserved to be punished. The investigation resulted in no punishment for Mr. Pollick because Mr. Pollick was cleared of all wrongdoing by the investigation and there was no reason to punish him.

e. Defendants falsely reported that "Pollick remained, but within a year, most of those board members had quit, one of many exoduses of staff or directors at GBF." This statement was false, as Defendants knew, and wrongfully implied that individuals fled GBF because of GBF or Mr. Pollick's conduct. Over the years, GBF has had to ask certain members of the board to step down when their goals or motives did not align with GBF, but there has never been an exodus of staff or directors.

f. Defendants falsely reported that "[a] recent outside investigation into a whistleblower's complaints against the head of the Giving Back Fund, the fiscal sponsor for Damar Hamlin . . . and other pro athlete charities, resulted in no

punishment for the executive." This statement was false, misleading, omitted material information, as Defendants knew, and implied that Mr. Pollick deserved to be punished. The investigation resulted in no punishment for Mr. Pollick because Mr. Pollick was cleared of all wrongdoing by the investigation and there was no reason to punish him. Defendants, who repeatedly referenced the investigation in the article, were aware that the investigation had concluded and that Mr. Pollick had been cleared of any and all wrongdoing.

g. Defendants falsely reported that "[i]n her resignation, [Ms. Pasternack] had recommended that GBF's board do a 12-point, top-down review of the organization, from its finances to various critical postings that had been made over the years on employment websites like Glassdoor and Indeed." This statement was false and misleading, as Defendants knew, because it wrongly implied that Ms. Pasternack made the decision to resign on her own. As set forth above, Ms. Pasternack resigned only when faced with a board meeting specifically called to vote on whether or not to remove her from the board for cause, where all board members were expected to vote for her removal. At that time Ms. Pasternack had already been asked to step down twice.

49. Moreover, many of the false statements set forth above were directly contradicted by Mr. Pollick's and GBF's written responses to Mr. Libit and Sportico who then disregarded those statements entirely. As examples only:

a. Mr. Libit wrote to GBF:

> As I understand, in late May, GBF's board retained an outside law firm to investigate the allegations [the Complaining Employee] raised in his whistleblower letter(s) to the board. As such, I was told that [the Complaining Employee] was put on paid leave pending the results of the investigation. It is my understanding that the investigation has since concluded. Can you provide me any on-the-record statement about the investigation, its breadth of focus, and its status?

Attorney Gray, of Rubin and Rudman responded:

> Rubin and Rudman was retained by The Giving Back Fund Board to conduct an investigation solely with regard to the specific allegations raised in [the Complaining Employee's] letter to the Board of Directors. We reviewed dozens of documents and interviewed involved staff over a five-week period. The findings of our investigation do not substantiate the allegations that were raised in the letter. Many of the issues set forth in the letter consisted of only a portion of the referenced situations. ***Looking at the issues in their entirety, a conclusion was reached that there was no illegal, unethical or improper action with regard to the issues raised.*** The investigation concluded that despite the allegations not being substantiated that [the Complaining Employee] filed the letter to the Board

> in good faith. However, the investigation also concluded that [the Complaining Employee] engaged in various other forms of activity which would be sufficient to warrant GBF to take actions, including disciplinary action, consistent with its policies and procedures.

(emphasis in original). While Mr. Libit included limited portions of Attorney Gray's statement, he did not include detail that showed the depth of Rubin & Rudman's extensive investigation.

b. Mr. Libit wrote to GBF:

> I was told that [the Complaining Employee] was fired last Friday. Was the termination related in any way to the original complaints [the Complaining Employee] raised about Marc Pollick, or anything to do with the subsequent investigation?

Mr. Pollick and GBF responded:

> Their termination was not related in any way to the original letter [the Complaining Employee] sent to the Board. [The Complaining Employee] had already received warnings about work performance and potentially fireable offenses long before the letter. The investigation of the claims made in the letter unfortunately validated and confirmed egregious and unlawful actions by this employee and recommended they be terminated.

Mr. Libit and Sportico did not include any of these details in the July 11, 2023 article.

c. Mr. Libit wrote to GBF:

> It is my understanding that the staff was informed in an emergency meeting last Friday about [the Complaining Employee's] departure. I heard that during that meeting, leadership indicated that they had yet to receive the final report from the outside investigation, but that Marc then interjected to say that he had a copy of the report. Is that accurate?

Mr. Pollick and GBF responded:

> Yes. The report was directed only to me and to the Board chair. It was not directed to other leadership. The investigation conducted by independent law firm Rubin and Rudman over the course of five weeks confirmed two major findings – egregious and unlawful actions and fire-able offenses by this employee while employed by The Giving Back Fund and that the complaints raised in the letter were baseless and without merit given documentation to the contrary.

Mr. Libit and Sportico did not include any of these details in the July 11, 2023 article.

50. Similarly, Mr. Libit and Sportico included only a limited, vague statement from Mr. Palakurthi regarding his faith in Mr. Pollick's leadership, rather than reporting on his extensive knowledge of GBF, the board, and Mr. Pollick based on his 26 years of involvement with the organization.

51. Upon information and belief, Defendants were concerned that their publications of and concerning GBF and Mr. Pollick were defamatory and sought the advice of counsel who advised to include in the articles that Plaintiffs (or someone on their behalf) had denied the false statements. If so, counsel's advice was incorrect as the fact that Defendants recognized the need to seek out counsel made clear that they knew or recklessly disregarded the truth and that they should not have published at all.

52. On February 8, 2024, Sportico and Mr. Libit published their third article, again written by Mr. Libit, falsely headlined "**Super Bowl Fundraiser BGBG Tries Luck in Vegas After Arizona 'Disaster'**" on its website, www.sportico.com/leagues/football/2024/giving-back-fund-big-game-big-give-super-bowl-las-vegas-1234765670/.

53. Defendants knowingly and maliciously published this article one day before GBF's biggest event of the year, the 2024 BGBG event, which was to be hosted by comedian Kevin Hart. Leading up to the event, Mr. Libit reached out to Mr. Hart's representatives for comment. Upon information and belief, Defendants chose to release the article the day before the BGBG event despite the article having been completed and ready for publication well before the publication date.

54. Sportico and Mr. Libit made additional false statements regarding GBF and Mr. Pollick in their February 2024 article and reported on the false statements of others without properly assessing the truth of the statements.

55. Those false statements in the third article include but are not limited to the following:

a. Defendants falsely reported "[t]hat the party has been able to survive for so long, former employees observed, owes in large part to the transient nature of the Super Bowl, offering Pollick a chance to start from scratch each year in a different city while the prior event's bridges smoldered behind him." This statement is false and omits material information, as Defendants knew. The BGBG events have been overwhelmingly positive and GBF has repeatedly worked with certain partners, celebrity hosts, and homeowners for multiple BGBG events.

b. Defendants falsely reported that "[f]ollowing the 2017 BGBG held in Houston, participants received tax deduction letters stating the event was 'able to raise more than $1 million for eight worthwhile charities.' On the Giving Back Fund's tax return that year, the fundraiser was shown to have grossed $1.36 million in revenue, while costing $1.11 million in directly related expenses. Making up that latter figure were rent and facility costs of $192,322; food and beverage costs of $194,208; $85,171 for entertainment; and $637,296 in 'other direct expenses.'" These statements were false, as Defendants knew. They did not reflect true numbers for the BGBG event and reflect categories of expenses that are not related to the BGBG event. For example, the use of the home where the event was held was donated and there was no rental cost at all. Further, donations to charities are typically part of the expenses of the event. These statements gave an extremely distorted impression to the reader, which is journalistically unfair.

c. Defendants reported the 2023 BGBG event planner's false statement that she had threatened to take legal action for nonpayment of a $22,500 fee. This report was false, as Defendants knew or should have known. There was no fee due and the event planner had in fact been overpaid. Defendants failed to properly validate this statement. In fact, GBF advised Defendants that she was paid more than she was owed prior to publication of the article. Defendants chose not to include GBF's position in its article.

d. Defendants falsely reported that "[u]nbeknownst to the public, however, is how many of these parties have left a trail of controversy." This statement was false, as Defendants knew, and wrongly implied that Defendants have information that a large number of the BGBG parties have been embroiled in controversy. This is not accurate, and indeed, GBF's events have been overwhelmingly positive and successful. In just its second year, 2010, BGBG was named the Number One Event at the Super Bowl by ESPN The Magazine. Indeed, GBF's event consistently has been hailed by hundreds of media outlets as the best at the Super Bowl, year in and year out.

e. Defendants falsely reported that "[t]his pattern of turmoil is attested to by hundreds of pages of documents and dozens of people who spoke to Sportico for this story, most on the condition that they not be identified, for fear of retribution." This statement is

false, as Defendants knew. Mr. Pollick has never taken "retribution" against any employee at any time, has not threatened to do so, and has not been reported as doing so.

f. Defendants falsely reported that "[t]he year before, the party in conjunction with the LA Super Bowl took place in the Metaverse—with some fairly adverse results . . . [.]" This statement was false, as Defendants knew. The event had been hosted by Rob Lowe, was the first Super Bowl event ever held in the Metaverse, and went very well. As one example only, Meta had donated to GBF its substantial work on the virtual stadium worth more than $2 Million and after the event donated the entire virtual stadium to GBF.

g. Defendants falsely reported that "[a]ll of a sudden, Pollick was presented with dueling objectives: the unassuming work running a fiscal sponsor for nonprofit clients, and the more glamorous job of rubbing elbows with A-listers on Super Bowl weekend. In time, according to a number of those who worked for Pollick, the latter came to outstrip the former." This statement is false, as Defendants knew. Mr. Pollick's focus is and has always been on the running of GBF and its philanthropy. The BGBG events attended by celebrities raised money not only for their own charities but also for GBF to allow it to pay salaries to its employees and to fund GBF's Fund for the Advancement of Philanthropy. This fund has allowed GBF to support worthy start-up nonprofits with limited funds and important missions that otherwise would not be able to get off the ground.

h. Defendants falsely reported, to support its claim that GBF was spending beyond its means, "[a]ccording to a copy of Wahlberg's hosting agreement *Sportico* obtained, GBF agreed to provide a private jet—specifically, an Embraer Legacy 600 aircraft—to shuttle the actor and up to a dozen guests from New Orleans to Los Angeles, to Phoenix, and then back to New Orleans." This statement falsely implied that GBF paid for the private jet, which was not true, as Defendants knew. The private jet was donated for the event and GBF has never paid for a private jet for any celebrity.

i. Defendants falsely reported that "[w]hile GBF has followed through on some of its celebrity appearance commitments for last year—Connie Watt, the mother of J.J. Watt, confirmed that their organization received its $100,000 remittance—representatives of Ray Lewis and Patrick Willis say they have not received their shares. And the Giving Back Fund's board now suggests it is not inclined to make good on those." This statement was false, as Defendants knew. These individuals were not paid because GBF never agreed to pay them and, like other celebrities, they donated their time to the event.

56. All of the above statements are false and defamatory. Defendants published all of the above false statements with actual malice, a knowing or reckless disregard of the truth, and/or negligently.

57. Again, prior to publishing the third article, Mr. Libit and Sportico had emailed Mr. Pollick and GBF to request information regarding topics addressed in the article. Mr. Pollick and GBF responded fully to those questions.

58. Nonetheless, as set forth above, Mr. Libit and Sportico disregarded the information that Mr. Pollick and GBF provided in their article in order to publish its false statements. As several examples only:

a. Mr. Libit wrote to Mr. Pollick:

> I've reviewed communications between GBF and Felisa Israel, documenting the strife between the parties following last year's BGBG. Some communications show you blaming Felisa for the way the event turned out and having a "distorted sense of reality." Did you resolve the matter with Felisa? And is GBF still the fiscal sponsor for Felisa's foundation?

Mr. Pollick responded:

> We no longer are her fiscal sponsor. She was given special discounts on her fees the entire time she was a client, and she left owing money. Many tasks that were her company's responsibility were left unfinished at the conclusion of the event by her and her team. Among many other issues, GBF auction items were not returned.

Mr. Libit and Sportico did not include this response in the third article, instead only reporting on Ms. Israel's claims.

b. Mr. Libit wrote to Mr. Pollick:

> Tax documents and interviews with sources appear to contradict the notion that the 2023 BGBG was the first to lose money. Sources told me that previous BGBG's barely broke even or lost money. GBF's tax filings from some years indicate the same. How would you respond to the claim that BGBG has a history of falling short of its financial targets?

Mr. Pollick responded:

> This is incorrect. We have never lost money and our tax filings do not indicate that. All fundraising totals and expenses are usually rolled up into one number and in a case where BGBG expenses are broken out, which would be rare, it includes the charitable donations as expenses but they are donations to others as well as reimbursing GBF as a charity also for its underwriting of the event.

In the article, although Mr. Libit and Sportico repeatedly reported that GBF's BGBG event had lost money and was a "drain[]" on its resources, it purportedly provided GBF's position with a single cursory sentence: "The Giving Back Fund insists this is not the case."

c. Mr. Libit wrote to Mr. Pollick:

> How long do you plan to continue in your role as GBF executive director? Have you and the board had any discussions about a leadership succession plan?

Mr. Pollick responded to Mr. Libit:

> Mr. Pollick serves GBF at the pleasure of the Board.

Mr. Libit and Sportico did not report on the GBF Board's oversite of Mr. Pollick's position. Instead, throughout its article, Mr. Libit and Sportico repeatedly, falsely reported that Mr. Pollick was using his position to benefit himself, and not in a manner that would ever have been condoned by the board that has gladly retained Mr. Pollick as CEO for decades. Far from benefiting himself, Mr. Pollick worked without taking any salary for the first two years that he led GBF. GBF's board passed a resolution to accrue those two years of salary at a modest interest rate and pay it when GBF had the funds available. By the time the funds were available, the amount had compounded to $541,640. Rather than take the accrued salary that was rightfully his, Mr. Pollick chose to donate all of the money back to GBF. For the first 20 years of his employment, Pollick did not request or accept a raise or even a Cost-of-Living Adjustment in salary.

59. In pursuit of their preconceived and sensationalistic agenda, Defendants carefully tailored their information gathering to rely only upon biased individuals, and specifically biased individuals who had been terminated for cause whom Defendants knew would have grievances they were likely to express in exchange for anonymity, and willfully failed to review public and other information available to them that would have disproven the information they relied upon. In short, Defendants deliberately decided to portray GBF as a failing entity and Mr. Pollick as a bad actor.

60. Defendants' numerous defamatory statements reached people across the country, and beyond, including in Massachusetts, via Defendants' self-described "robust" network, and

resulted in harm to both GBF and Mr. Pollick's reputations in Massachusetts and across the country.

**Sportico's and Mr. Libit's Interference with GBF's and Mr. Pollick's Business**

61. As alleged above, Defendants intentionally released their February 8, 2024 article one day before GBF's 2024 BGBG, which was to be hosted by the internationally known comedian Kevin Hart. Mr. Libit reached out to Mr. Hart's representative for comment prior to publishing the article. Mr. Libit knew at the time that he contacted Mr. Hart's representative that Mr. Hart was scheduled to host the BGBG.

62. Mr. Libit advised Mr. Hart's representative that he was about to publish a negative article about GBF, Mr. Pollick, and the BGBG. Upon information and belief, Mr. Libit advised Mr. Hart's representative of numerous falsities of and concerning GBF and Mr. Pollick in order to convey the false message that BGBG was a financial disaster and worse.

63. As a result of Mr. Libit's false statements to Mr. Hart's representative, Mr. Hart drastically reduced his role and profile at the event. Mr. Hart instructed GBF that (1) GBF could not use his name or likeness in promoting the 2024 BGBG event; (2) GBF could not inform anyone that Mr. Hart would be hosting the event; and (3) GBF could not put GBF signage at the event—which was GBF's own event.

64. As a result of Mr. Hart's limitations, GBF was unable to properly promote the BGBG event. Because of Mr. Libit's interference, revenue from the event was substantially decreased, by more than $2 million.

65. Mr. Libit's interference destroyed the prior advantageous relationship between GBF and Mr. Hart.

## V. COUNTS

### COUNT I - DEFAMATION

**The Giving Back Fund, Inc. and Marc Pollick v. Defendants**

66. Plaintiffs repeat and reallege here all of the allegations set forth above.

67. Sportico and Mr. Libit published their false and defamatory statements of and concerning Plaintiffs with actual malice—a knowing or reckless disregard of the truth. Plaintiffs are not public figures nor are they limited purpose public figures such that they need only prove Defendants' negligent publication.

68. Sportico and Mr. Libit's defamatory statements of and concerning Plaintiffs were defamatory per se.

69. Sportico and Mr. Libit's defamatory statements damaged GBF and Mr. Pollick for which Sportico and Mr. Libit are liable.

### COUNT II – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

**The Giving Back Fund, Inc. v. Defendants**

70. Plaintiffs repeat and reallege here all of the allegations set forth above.

71. GBF had a business relationship with Mr. Hart.

72. Mr. Libit was aware of GBF's business relationship with Mr. Hart.

73. Mr. Libit intentionally contacted Mr. Hart on behalf of Sportico in order to publish false and defamatory statements regarding GBF and Mr. Pollick to him in order to cause damages to GBF and to further Defendants' false story. Mr. Libit acted intentionally with the improper motive of undermining GBF's relationship with Mr. Hart and to harm GBF.

74. As a result of Mr. Libit's interference, Mr. Hart significantly curtailed his involvement with GBF.

75. GBF suffered harm as a result of Mr. Libit's interference with GBF's business agreement with Mr. Hart including lost business and lost income.

**COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Marc Pollick v. Defendants**

76. Plaintiffs repeat and reallege here all of the allegations set forth above.

77. Defendants knew and intended that their publication of false statements concerning Mr. Pollick and the GBF would cause Mr. Pollick emotional distress.

78. Defendants' conduct as set forth above was extreme and outrageous and beyond the bounds of common decency.

79. Mr. Pollick suffered severe emotional distress as a result of Defendants' conduct.

80. Mr. Pollick's severe emotional distress, caused by Defendants' intentional, malicious conduct, was of such a nature that no reasonable person could be expected to endure it.

81. Defendants' actions resulted in damages to Mr. Pollick, including ongoing severe emotional distress and monetary losses.

**COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**Marc Pollick v. Defendants**

82. Mr. Pollick repeats the allegations set forth above as if fully contained herein.

83. Defendants took actions that they knew or should have known would cause Mr. Pollick emotional distress.

84. Mr. Pollick suffered severe emotional distress as a result of Defendants' negligent conduct, including without limitation causing him nausea, loss of appetite, sleeplessness, and anxiety.

85. A reasonable person would have suffered emotional distress as a result of Defendants' actions.

86. Defendants' actions resulted in damages to Mr. Pollick, including ongoing severe emotional distress and monetary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs The Giving Back Fund, Inc. and Marc Pollick respectfully request that this Court:

i. enter judgment in favor of Plaintiffs and award Plaintiffs damages on the counts set forth above;

ii. order injunctive relief requiring Defendants to immediately remove the articles referenced in Paragraphs 25, 43, and 52 from the Sportico website and any other medium in which they published or referenced the articles and preventing Defendants from disseminating the articles further;

iii. award The Giving Back Fund, Inc. and Marc Pollick their attorneys' fees and costs; and

iv. grant such other and further relief as the Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

THE GIVING BACK FUND AND MARC POLLICK,

By their attorneys,

*/s/ Howard M. Cooper*
Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Maria T. Davis (BBO # 675447)
mdavis@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated: July 2, 2026

**CERTIFICATE OF SERVICE**

I, Howard M. Cooper, hereby certify that on this 2nd day of July 2026, I caused a true and accurate copy of the foregoing document to be served on counsel of record for all parties via email.

Jeffrey J. Pyle, Esq.
Prince Lobel Tye LLP
One International Place, Suite 3700
Boston, MA 02110
jpyle@princelobel.com

*/s/ Howard M. Cooper*
Howard M. Cooper

# Exhibit A

I am a reporter for Sportico, the sports business publication, working on a story about the Giving Back Fund. I've heard from sources about a lot of turmoil and issues within the organization. Hoping to confirm/learn some things from you. Happy to grant you anonymity, as I have with other sources. Please message or call me at your earliest convenience.

Thank you,

Daniel Libit
Sportico
[redacted]

# Exhibit B

Date Filed 7/21/2026 11:32 AM


[redacted]

May 27, 2026

To: Scott Soshnick
Editor, Sportico
ssoshnick@sportico.com

Daniel Libit
Reporter, Sportico
dlibit@sportico.com

Dear Mr. Soshnick and Mr. Libit:

My name is [redacted]. It has come to my attention that you published in Sportico a letter I wrote to my then-employer, The Giving Back Fund, Inc., regarding that company and its CEO, Marc Pollick. I also understand that in your articles you quoted my letter and made repeated references to it.

Please be advised that I did not give Sportico or Mr. Libit permission to use my letter, or to publish my letter, or to quote or reference my letter in the articles. I still do not give any such permissions to Sportico or Mr. Libit. Further, I did not send my letter to Sportico, nor did I give anyone permission to send my letter to Sportico. That letter was intended to be confidential to the addressees. In fact, in the course of writing these articles Mr. Libit reached out to me and I specifically informed him that I declined to be involved in any way.

Further, please be advised that there were certain allegations in my letter which were incorrect, exaggerated and/or for which I did not have facts to base them. I regret writing that letter in that form because of this. If I could turn back the clock, I would not have submitted that letter in that form.

I cannot turn back the clock, of course, but to fix any problems I may have inadvertently caused I wish for Sportico to promptly remove my letter from its website and from its articles, to remove any quotations Sportico may have used from my letter, and to remove any references to my letter from the Sportico website and its articles. I reserve all rights, but at a minimum please abide by my request herein.

Thank you.

Sincerely,

[redacted]